[No. D019464. Fourth Dist., Div. One. Jan. 21, 1994.]

REGAN ROOFING COMPANY, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
KENN FINKELSTEIN et al., Real Parties in Interest.

## COUNSEL

McInnis, Fitzgerald, Rees & Sharkey, Anna Frustaglio-Roppo, Jeanne Simpson-White and Daniel P. Closser, Jr., for Petitioners.

No appearance for Respondent.

Gerard, Selden, Osuch & Johnson, Lawrence T. Osuch, Lynde Selden II, Greco & Traficante, Paul A. Traficante, Scott A. Johnson and Jon S. Brick for Real Parties in Interest.

## OPINION

**HUFFMAN, J.**—Petitioners Regan Roofing Company, Inc., and Vince Ramirez doing business as Pacific Rebar (collectively Regan Roofing) challenge certain aspects of a pretrial settlement reached between 44 individual homeowners (Kenn Finkelstein et al., collectively plaintiffs) and the developer of plaintiffs' homes, Leisure Technology Corporation of Oceanside (developer). Pursuant to Code of Civil Procedure section 877.6,[1] plaintiffs and developer obtained trial court approval of their settlement for a $2 million payment and a $5,000 assignment of indemnity and contribution rights as being in good faith within the meaning of *Tech-Bilt, Inc. v. Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159] (*Tech-Bilt*). Regan Roofing, as well as some 20 other construction subcontractors, tradespeople and design professionals, were not parties to the plaintiff/developer settlement, and opposed that settlement as not being in good faith, chiefly on the theory that the settlement provided an inadequate

---

[1]All statutory references are to the Code of Civil Procedure unless otherwise specified.

amount of setoff or credit to which the nonsettling defendants would be entitled in the event that the plaintiffs obtained judgments against the nonsettlors after a jury trial or other proceeding.

Regan Roofing is the only nonsettling party which has petitioned this court for a writ of mandate to set aside the trial court's approval of the settlement;[2] it raises both the general objection that the settlement does not adequately set forth the amount of credit to which Regan should be entitled, and a challenge to three particular categories of settlement consideration to which settlement funds were allocated. These three categories include $360,000 noneconomic damages allocated to emotional distress claims (Civ. Code, § 1431.2), $250,000 allocated to investigative costs (i.e., expert investigation fees), and $132,184.26 for recoverable litigation expenses (e.g., filing fees and deposition costs). The balance of the $2 million settlement payment, $1,262,815.74, was allocated to "all disputed issues of construction defects." In addition to claiming it will not receive appropriate offsets in these categories, Regan Roofing argues that the $5,000 value placed by the settling parties upon the developer's assignment of indemnity and contribution rights to the plaintiffs, as against the nonsettling defendants, was too low, arbitrary, and creates the potential for double recovery or unjust enrichment.

In the recent opinion by this court in *Erreca's* v. *Superior Court* (1993) 19 Cal.App.4th 1475 [24 Cal.Rptr.2d 156] (hereafter *Erreca's*), this court had occasion to address many of Regan Roofing's general claims about the appropriateness of pretrial settlements which include allocations by the settling parties to particular disputed issues or claims in the underlying lawsuit, reached in the absence of participation by nonsettling parties. We also discussed the use of an assignment of indemnity rights as settlement consideration, and the proper procedure for valuing such an intangible settlement asset and giving appropriate credit to nonsettling defendants, due to the payment of settlement monies by others, against any eventual plaintiff's judgment. (§ 877, subd. (a).) We shall now apply the principles set forth in *Erreca's* to this set of facts, which raises several new issues we have not yet had the opportunity to address.

---

[2]In addition to Regan Roofing, the other nonsettling defendants, representing a variety of trades and professions, are Concrete Concepts, Inc.; West Coast Sheet Metal; T-Four Tile; Chilcote, Inc.; Claude Irwin Tile; Gage Construction Company; Oceanside Plumbing, Inc.; Classic Home Protection, Inc.; Overhead Door Corporation; Franklin Reinforcing Steel, Inc.; S. G. Zoumaras Co.; Design Plus, Inc.; O'Strand, Inc.; California Glass and Mirror, Inc.; Craig Allin Construction and South Western Construction; Ninyo & Moore; San Diego Waterproofing; Kennington Plastering, Inc.; and Gouvis Engineering. At oral argument, the parties estimated that at the time the settlement was approved, there were some 30-32 nonsettling parties. The record shows that 22 of these, including petitioners, filed opposition to the settlements; we use the figure 22 nonsettlors for purposes of discussion.

As we will explain, we conclude that the challenged allocations made by these settling parties to the various categories set forth above (emotional distress, investigative costs, and litigation expenses) had an adequate evidentiary basis and were reached in appropriately adverse proceedings in order to justify the presumption that the valuation placed upon these settlement assets was reasonable. (*Abbott Ford, Inc.* v. *Superior Court* (1987) 43 Cal.3d 858, 879 [239 Cal.Rptr. 626, 741 P.2d 124] (*Abbott Ford*).) There is substantial evidence to support the trial court's approval of the settlement in those respects. (*Toyota Motor Sales U.S.A., Inc.* v. *Superior Court* (1990) 220 Cal.App.3d 864, 870-871 [269 Cal.Rptr. 647].) Moreover, the trial court's resolution of the offset issue was adequate. However, with respect to the $5,000 valuation placed by the parties upon the assignment of indemnity rights, this record lacks a factual basis to support such a valuation, and we grant the petition to require the trial court to conduct further proceedings concerning an appropriate valuation for such an intangible asset given in settlement.

## FACTUAL AND PROCEDURAL BACKGROUND

Between 1988 and 1990, developer was the general contractor and developer of a 240-unit residential subdivision in Oceanside, California. Plaintiffs in this action consist of 44 individuals who reside in 24 of these homes. In three consolidated complaints against developer, plaintiffs allege a number of design and construction defects in their homes. They also brought in as parties to the case a number of design professionals and subcontractors, and many of the same design professionals and subcontractors (and more) were sued by developer in its cross-complaint for indemnity, declaratory relief, breach of contract and warranty, and negligence. Many of these cross-defendants took the position that the developer's accelerated construction schedule had caused most of the problems at the property.

In the plaintiffs' complaints, they had alleged along with design and construction defect theories (negligence and strict liability) certain causes of action for nuisance and negligent infliction of emotional distress, and had sought damages for emotional distress based on those causes of action. Before the settlement was reached, the developer brought an unsuccessful motion for summary adjudication (§ 437c, subd. (f)) seeking an order which would have declared emotional distress damages unavailable in this property damage case. In its order denying the motion, the trial court stated in part that plaintiffs had alleged a special relationship existed between the developer and the plaintiffs such that damages for negligent infliction of emotional distress might be recoverable, and ruled that plaintiffs could properly maintain a cause of action for nuisance even though the developer no longer had any interest in the property.

Extensive discovery and investigation of the defects at the homes ensued, and depositions were taken of all plaintiffs, subcontractor and design professional personnel, and dozens of expert witnesses. The parties attended mediation conferences before a court-appointed special master and a mandatory settlement conference before the trial court, but no global settlement was reached. The trial court then ordered that the trial would be conducted in phases, beginning with plaintiffs, the developer, and the architect. Plaintiffs and developer then reached this settlement in the sum of $2 million plus an assignment of the developer's indemnity rights.[3] This settlement was contingent upon a finding that it was entered into in good faith pursuant to section 877.6, and the developer accordingly applied for a finding of good faith settlement. Virtually all the nonsettling parties opposed the motion for good faith settlement or joined in opposition by others. (See fn. 2, *ante.*)

In support of the developer's application for good faith settlement approval, plaintiffs' attorney wrote a letter to all counsel setting forth the allocation language to be incorporated into the settlement agreement and release to be executed. These allocations were based upon repair recommendations and cost estimates set out by plaintiffs' expert construction consultant, Thomas Benke. The letter stated that the allocation of settlement monies and other consideration paid by the developer was as follows:

"a. $15,000.00 per home for emotional distress ($360,000.00);

"b. $250,000.00 for investigative costs;

"c. $132,184.26 for recoverable court expenses;

"d. $1,262,815.74 for all disputed issues of construction defects."[4]

Plaintiffs' counsel's letter further explained the allocations made and the value of the assignment of rights as follows:

"Each home is designated a percent based in substantial part upon the relationship of the individual cost of repair to the total for all homes. Allocations of consideration based upon categories of construction defects will be done on a pro rata basis again utilizing Mr. Benke's cost of repair estimates.

[3]The developer had previously filed for and then emerged from reorganization proceedings in bankruptcy court (11 U.S.C. § 1101 et seq.), and essentially had no assets except insurance coverage, which was disputed.

[4]We have attached as appendix A to this opinion the plaintiffs' document showing a breakdown of settlement consideration paid by the developer on a per home basis.

"Questions have also arisen as to the valuation of the assignment of [developer's] causes of action to the plaintiffs. The assignment has been valued at $5,000.00 for purposes of settlement."

Plaintiffs' counsel's letter incorporated by reference their expert Benke's cost estimate of May 7, 1993, on which he had been questioned at his deposition. We have attached to this opinion as appendix B Mr. Benke's summary of the various defects at the property, which included thirteen categories of architectural defects (e.g., roofs, chimneys, stucco, doors, etc.), as well as five categories of noncontractors' items relating to repair costs (e.g., architectural and engineering plans and permits, construction inspections, and moving and living expenses) and, finally, five categories of drainage defects (e.g., retaining walls, deepened footings and drains). Plaintiffs' counsel's letter further stated that the parties had agreed to use one of the four repair estimates by Benke, alternative 1A for total repair costs, for purposes of determining the pro rata allocations to be made of the settlement consideration. The total estimate of these costs for alternative 1A, also including an item for a one-foot cap of flatwork (grading), was $5,610,971.[5]

In further support of the application for good faith settlement approval, the developer stated that its experts estimated that necessary repairs would be in the amount of $583,538. In response to the objections raised to the settlement (§ 877.6, subd. (a)(2)), the developer further explained the allocations made as follows:

"The allocation in this case makes a pro rata distribution to each of the twenty-four homes based upon the cost of repair estimate[s] done by plaintiffs' expert, Thomas Benke. While [developer] does not accept or adopt the repair estimates of Mr. Benke, it was utilized in allocation because it is based upon an issue by issue and house by house breakdown of damages. The same issue designation was utilized by most experts in this case.

"In addition, Mr. Benke was extensively deposed regarding his repair estimates and all parties should have a thorough understanding of the basis of his allocations, regardless of whether they agree with them or not. A subcontractor such as a roofer or framer, therefore, can determine how much money was paid to each individual home and to their particular subtrade by utilizing Mr. Benke's house by house breakdown of issues and the percentage allocated to each individual home.

---

[5]We have also attached as appendix C, as an illustration of Benke's individual home cost estimates, a preliminary estimate for the Akin residence showing the use of particular figures for most of these various defects. The total estimate for that particular house under alternative 1A was $233,238.

"This formula allows the two million dollars in monetary consideration paid by [developer] to be susceptible to a mathematical calculation, based upon an issue by issue breakdown of alleged costs of repair. Given the complexity of the issues in this case and the number of parties involved, it is difficult to conceive of a better method to allocate the monies paid. Moreover, the allocation fairly apportioned a share of potential liability to [developer]."

The developer's reply to the objections to the settlement further explained that a $5,000 value had been placed upon the assignment of indemnity rights to the plaintiffs, and stated that the basis for that valuation included the fact that the plaintiffs had direct actions through their complaint against most of the design professionals and subcontractors involved in the litigation, and were seeking to add the remaining parties as direct defendants.[6] Developer also argued that the design professionals and subcontractors who were subject to contractual indemnity causes had declined to accept its tender of defense and request for indemnification, and had thus far considered the indemnity rights to be of little value, which led the settling parties to value them at a low figure accordingly. However, no declaration addressing the basis for that valuation in terms such as cost to prosecute the indemnity actions, probability of prevailing on the claims, or likelihood of collection of any judgment was submitted in support of that valuation.

Nonsettling parties first argued they should obtain a full $2 million credit against any eventual plaintiffs' judgment, since the developer had paid that sum. (§ 877, subd. (a).) They also complained that an inadequate breakdown had been given among damages categories (emotional distress and construction defects, as well as the investigation and litigation costs categories). In their view, the allocations should have been made specifically among damage categories, by trade, or by defendant, to enable more precise offsets to be calculated.

At the hearing on the good faith settlement application, a spirited discussion was held on the allocation issues. The court first noted that it was satisfied that the developer's insurance coverage had been maximized and that all available settlement assets had been marshaled. Although several of the nonsettling parties argued that a particular allocation of settlement consideration should be made by trade, as to a percentage of the consideration paid, the court declined to do so, stating that it would not be possible to reach settlements in complex construction defect cases if such precision were required. Plaintiffs' counsel pointed out that the settlement was broken

---

[6]That motion to join remaining parties as defendants was granted at the good faith hearing motion.

down per house and by defect, and was exact as to some trades (e.g., ceramic tile), but not as to others (e.g., sheet metal, which could include roofing, pot shelves, etc.). The developer's attorney admitted that a defect such as a drywall crack could possibly have been caused by the mass grader, the finish grader, the framer, the drywaller, or the painter, but stated that those issues could not then be resolved by the settling parties.

The court ruled that an adequate allocation had been made in the settlement and that the potential offsets against any eventual plaintiffs' judgment against the nonsettlors could be calculated by a mathematical formula to be used on the plaintiffs' cost estimate in accordance with the particular trade involved. The court made a similar ruling on the category of settlement consideration for emotional distress damages, stating that a mathematical calculation could be made along with a liability allocation to the particular nonsettling defendants charged with and eventually found responsible for any emotional distress damages. The court stated that those responsible for emotional distress damages would bear a pro rata share, and that those not responsible would be released from liability and would not be entitled to any setoff in a future judgment. The court declined to reserve jurisdiction on the amount of allocation and offset to the emotional distress category until after a trial, finding that the allocation to that type of damages was proper at the settlement stage.[7]

On the issue of investigative costs, the court found that the expert fees incurred for the purpose of discovery of the defects at the properties were proper recoverable costs, and were a ballpark figure for settlement purposes. (*Tech-Bilt*, *supra*, 38 Cal.3d at p. 499.) The court refused to give a breakdown of investigative costs that were arguably incurred for litigation or trial purposes only, as opposed to discovery of defects.

The court then turned to the issue of the valuation of the assignment of indemnity rights as settlement consideration. Regan Roofing's counsel argued that the $5,000 valuation of the assignment was completely insufficient, and that such an assignment of rights represented a possibility of double recovery because the plaintiffs also had their own negligence cause of action against the majority of the subcontractors. The court assured counsel that it would not permit a double recovery to occur, and that "insofar as any such assignment would create a situation of double recovery the Court will find that it's an illegal agreement and unenforceable." Regan

---

[7]Plaintiffs' counsel observed to the court that one of the reasons it had settled the emotional distress claims was because the court had instructed it to find some creative way to try those claims, as the court expressly stated it did not want to have 44 plaintiffs crying on the witness stand.

Roofing's counsel then argued that the assignment of rights should be given the same value as the potential recovery at trial pursuant to that assignment or, in the alternative, that the assignment of rights was valueless. Plaintiffs' counsel responded that he would stipulate that the assignment was worth nothing, but that he agreed to take it because it had been offered to him. He explained that the various subcontractors had refused to honor their contractual indemnity agreements and that, under the circumstances, he thought a $5,000 estimate of value was fair. The court agreed. The court then approved the settlement as being in good faith under the *Tech-Bilt* standards.

Regan Roofing filed this petition for writ of mandate to challenge the approval of the settlement. We issued an order to show cause and stayed the trial date.

## DISCUSSION

██ In this court's recent published opinion in *Erreca's* (*supra*, 19 Cal.App.4th 1475), we discussed the two competing policies established by sections 877 and 877.6: (1) The equitable sharing of costs among the parties at fault; and (2) the encouragement of settlements. (*Tech-Bilt, supra*, 38 Cal.3d at pp. 494-496.) Sections 877 and 877.6 together provide that "while a good faith settlement cuts off the right of other defendants to seek contribution or comparative indemnity from the settling defendant, the nonsettling defendants obtain in return a reduction in their ultimate liability to the plaintiff." (*Abbott Ford, supra*, 43 Cal.3d at pp. 872-873.) Section 877, subdivision (a) thus operates to reduce claims against other joint (as opposed to several) tortfeasors. (*In re Piper Aircraft* (N.D.Cal. 1992) 792 F.Supp. 1189, 1192.)

In *Erreca's*, we adhered to the guidelines set forth in *Alcal Roofing & Insulation v. Superior Court* (1992) 8 Cal.App.4th 1121 [10 Cal.Rptr.2d 844] (*Alcal*), for establishing the good faith of a settlement that includes allocations among particular disputed issues. ██ That court stated: "At a minimum, a party seeking confirmation of a settlement must explain to the court and to all other parties: who has settled with whom, the dollar amount of each settlement, if any settlement is allocated, how it is allocated between issues and/or parties, what nonmonetary consideration has been included, and how the parties to the settlement value the nonmonetary consideration." (*Alcal, supra*, 8 Cal.App.4th at p. 1129.)

To those *Alcal* guidelines, we added in *Erreca's* the considerations that the party seeking confirmation of a settlement must explain to the court and to all other parties the evidentiary basis for any allocations and valuations

made, and must demonstrate that the allocation was reached in a sufficiently adversarial manner to justify a presumption that the valuation reached was reasonable. (*Erreca's, supra,* 19 Cal.App.4th at pp. 1495-1496; *Abbott Ford, supra,* 43 Cal.3d at p. 879.) We emphasized, however, that the court hearing the good faith motion was not required to conduct an evidentiary hearing on the basis for the allocation, but instead had been accorded wide discretion to control "[t]he nature, extent and the procedure" applicable to any challenges to the valuation placed on the settlement by the settling party. (43 Cal.3d at pp. 879-880, fn. 23.)

We now have the opportunity to apply these guidelines to a vastly different factual situation than was presented in *Erreca's,* involving a vastly more complex settlement. (See appens. A, B, attached.) In *Erreca's, supra,* 19 Cal.App.4th 1475, the allocation made was simply between soils and nonsoils issues, and there was only one group of nonsettling parties, all soils defendants. In contrast, here we are dealing with four major categories of issues (i.e., architectural,drainage, repair costs and flatwork), most of which have numerous subcategories. Also, instead of one group of nonsettling soils defendants, we have some 22 nonsettling defendants who represent different trades and design professions. (See fn. 2, *ante.*) Moreover, instead of dealing with a discrete group of plaintiffs as in *Erreca's* (the homeowners association and class representatives), who would split up the settlement proceeds internally, the settlement in this case divides settlement proceeds among the 24 involved homes. Although this complex settlement is difficult to fit into the "good faith" methodology, we believe that by following the *Alcal* and *Erreca's* guidelines we can determine the validity of the petitioners' particular challenges to the components of this settlement.

I

*Overall Allocation of Settlement Consideration*

■ "The statutory requirement of good faith extends not only to the amount of the overall settlement but as well to any allocation which operates to exclude any portion of the settlement from the setoff. [Citations.]" (*Knox v. County of Los Angeles* (1980) 109 Cal.App.3d 825, 837 [167 Cal.Rptr. 463].) ■ Here, Regan Roofing as a nonsettling defendant claims that it is not possible to determine from the settlement and the Benke cost of repair estimate what amount of offset it will eventually receive in the event that plaintiffs recover a judgment against it. The Benke cost estimate lists a number of roof-related defects (roofs, chimneys, attic, and possibly structural), as to which some settlement monies were allocated per house. The repair costs items in the cost estimate (e.g., architectural and engineering plans,

inspections during construction, and moving and living expenses) would also presumably be attributed to the roofing defendant, among others. (See appen. B, attached.) Regan Roofing, however, complains that some of the other defect categories, such as drainage and many of the architectural costs, do not seem to be directed toward roofing defects and would thus seem to be excluded from any offset that Regan Roofing as a nonsettlor would eventually be entitled to receive.

■ To test the good faith of these allocations which operate to exclude a portion of the settlement from the setoff available to individual nonsettling defendants, the overall inquiry is whether the settlement is "grossly disproportionate to the settlor's fair share" and thus not subject to approval by the court. (*Abbott Ford, supra,* 43 Cal.3d at pp. 874-875.)

"Evaluation of the parties' allocation of settlement proceeds is committed to the sound discretion of the trial court in the good faith settlement approval process. The court may rely on its own expertise and the opinions of experts in reaching a determination of the good or bad faith of a settlement. [Citation.] However, the court may not be able to do more than simply make a best estimate, and any challenge to the agreement's assigned value should not be interpreted as giving the challenging defendant a right to a minitrial on the valuation issue. 'The nature, extent and the procedure regarding any such challenge is left to the discretion of the trial court.'[Citation.]

"In *Toyota Motor Sales U.S.A., Inc.* v. *Superior Court* (1990) 220 Cal.App.3d 864, 878, footnote 9 [269 Cal.Rptr. 647], the court observed that '. . . any factual findings or determinations made on contested issues of liability or damages are tentative and solely for the purposes of evaluating the good faith of a proposed settlement *as of the date of such a valuation.*' (Original italics.) ■ On appellate review, a trial court's determination of good faith of a settlement involving the resolution of factual issues will be upheld if supported by substantial evidence. [Citation.]" (*Erreca's, supra,* 19 Cal.App.4th at pp. 1489-1490.)

■ Since the settling parties have the most knowledge of the value of the various claims they are attempting to settle, they are required to make an allocation of settlement proceeds among those various claims, subject to court approval of the showing made. This situation is analogous to cases in which settlement payments are contingent or where noncash consideration is paid for settlement. (*Arbuthnot* v. *Relocation Realty Service Corp.* (1991) 227 Cal.App.3d 682, 689-690 [278 Cal.Rptr. 135].) Moreover, where an allocation is made of settlement proceeds which will affect the ultimate setoff or credit that a nonsettling defendant will receive against any future judgment,

the allocation may not be given presumptive effect unless it was the product of adverse negotiation. (*Peter Culley & Associates* v. *Superior Court* (1992) 10 Cal.App.4th 1484, 1497-1498 [13 Cal.Rptr.2d 624].)

■ Applying these standards, we look to the record to determine whether there is evidentiary support and a proper adversarial basis for the allocations among defect categories that were made here. Plaintiffs' estimator Benke was deposed about his cost estimate and it was available to all the parties for examination. The trial court was presented with information that the developer's cost estimate for repairs was $583,538, while plaintiffs' cost repair estimates ranged from $5,610,971 (alternative 1A) to $11,283,246. The court had the information that the developer's own cost estimator placed its proportional share of defects at 10 to 20 percent, since it had not performed the actual work on the property but should bear some responsibility as the general contractor and developer. Regan Roofing's cost estimator placed the developer's allocation of fault at 15 percent, while the plaintiffs' estimator placed the developer's fault at between 17.8 and 35.7 percent. The developer's attorney submitted a declaration referring to the developer's insurance coverage problems and its bankruptcy proceedings. The developer represented to the court that it had available a $2 million maximum contribution to settlement. The court thus had a number of evidentiary facts from which to reach an evaluation of the settlement.

In *Erreca's, supra*, 19 Cal.App.4th at pages 1498-1500 and footnote 7, we discussed the issue of the appropriate time for setting a credit against a potential future judgment based upon settlement consideration. We observed that, consistent with the reasoning in *Southern Cal. Gas Co.* v. *Superior Court* (1986) 187 Cal.App.3d 1030, 1036 [232 Cal.Rptr. 320], and *Arbuthnot* v. *Relocation Realty Service Corp., supra*, 227 Cal.App.3d at pages 690-691, the credit or offset to be accorded a nonsettling defendant should normally be fixed at the time that the settlement is reached, since the issue of the credit is part of the overall good faith determination. In this case, rather than fixing upon certain numbers for the award of credit to the various nonsettling defendants, the trial court found that since the settling parties showed that the allocation of consideration based upon categories of construction defect should be done on a pro rata basis, using the Benke cost of repair estimate, a mathematical formula could then be applied to determine the various nonsettling defendants' offset. The court declined to require a breakdown of the settlement consideration by trade or by party, stating that the mathematical calculation using the pro rata formula would be adequate.

To evaluate this exercise of discretion and these factual findings by the trial court, we first recognize that the four major categories of defects used

by Benke in his cost estimate will inevitably have some degree of overlap between trades and design profession. For example, as the plaintiffs' attorney stated, a sheet metal contractor might be found to have some responsibility in roofing, pot shelves, fireplace boxes or other categories. Similarly, a particular defect, such as a drywall crack, might be attributable to grading, framing, drywall, or even painting. ■■ ■■ Nevertheless, the inquiry at the good faith settlement stage is not the same as the inquiry at trial, where complete precision of allocation could presumably be achieved. Since we are dealing with a pretrial settlement, in which the factual findings or determinations made on contested issues of liability or damages are tentative, and made solely for purposes of evaluating the good faith of a settlement as of the date of the valuation (*Toyota Motor Sales U.S.A., Inc.* v. *Superior Court*, *supra*, 220 Cal.App.3d at p. 878, fn. 9), we must necessarily apply a broader and more permissive standard for evaluating good faith of a settlement as to such allocation. To require settling parties to make a complete explanation of their rationale for the allocation of settlement consideration or to set forth a factual matrix showing the allocation by trade or by defendant would serve to discourage pretrial settlements in complex matters such as this, due to the difficulty of making such a precise showing at the settlement stage.

Instead, what should be required of the settling parties is that they furnish to the court and to all parties an evidentiary showing of a rational basis for the allocations made and the credits proposed. They must also show that they reached these allocations and credit proposals in an atmosphere of appropriate adverseness so that the presumption may be applied that a reasonable valuation was reached. (*Abbott Ford*, *supra*, 43 Cal.3d at p. 879.) The settlement should represent a rough approximation of the settlor's proportionate liability, as well as a recognition that a settlor should pay less in settlement than after a trial. (*Tech-Bilt*, *supra*, 38 Cal.3d at p. 499.)

Another factor adding complexity to this situation is that these plaintiffs have sued individually, rather than as a class or association, for damages to these 24 homes; if the matter goes to trial against the nonsettling defendants, presumably, 24 special verdicts for the damages for each home will have to be reached and it will not be possible to lump all the plaintiffs' verdicts together for purposes of calculating the offsets. Instead, it seems that 24 separate credit calculations will have to be made for each nonsettling defendant, considering the particular types of defects at each house.

Considering all these factors, we believe the trial court was justified in concluding that the use of the pro rata formula to allocate settlement consideration among the various categories of defects was an adequate resolution of the credit or offset issue at the good faith settlement stage of

the proceedings. ▆ As we noted in *Erreca's, supra,* 19 Cal.App.4th at page 1500, footnote 7, "Determination of the credit issue *to the extent possible* cannot be deferred until after any eventual jury verdict, because the entire settlement must be determined to be in good faith as to both settling and nonsettling defendants. [Citation.]" (Italics added.) ▆ To the extent possible here, the court's instructions concerning the use of the pro rata formula are an adequate resolution of the credit issue at this stage, and may be used by the nonsettling defendants for calculating a rough approximation of their potential liability exposure and their consequent settlement posture. While the formula is not at present certain, it represents a resolution of the offset issue which is capable of being made certain, since the amount of settlement consideration, the types of defects at each home, and the number of nonsettling defendants can all be determined and analyzed.[8]

We recognize that after any future trial of plaintiffs' claims against the nonsettling defendants, the trial court may have to take evidence to calculate the offsets due those defendants, in distinguishing among the various defect categories. However, at the pretrial stage, the rough categories used are adequate for the task. Accordingly, when we apply the standards of *Alcal* and *Erreca's* to this allocation, we find that the settlement passes good faith muster under *Tech-Bilt* insofar as the overall offset issue is concerned.

II

*Emotional Distress Damages*

▆ Regan Roofing next argues that the allocation in the settlement of $360,000 to the 44 plaintiffs' emotional distress claims, at approximately $15,000 per each of the 24 houses involved, was disproportionate and arbitrary. Specifically, Regan Roofing complains that under Civil Code

---

[8]To give an illustration, suppose the plaintiffs go to trial against 20 nonsettling defendants, including Regan Roofing, and recover 24 plaintiffs' special verdicts on their direct claims (not indemnity) of varying amounts according to proof. As to the Akin home (see appens. A, C), suppose $250,000 is recovered. (Recall that in settlement, the Akins received 4.1 percent of the amount paid: $67,445 not including emotional distress damages, plus $10,250 for investigative costs and $5,419.60 for litigation costs [see appen. A].) To calculate Regan Roofing's credit, one notes that the developer paid as to Akin $8,314 for roofs, $651 for chimneys and $75 for attics (all the roof-related items). Regan Roofing would get a credit in that latter sum as to Akin, plus 1/20 of the "non-contractors items" repair costs (there, $13,757), plus 1/20 of the investigation costs and litigation expenses listed above (see pt. III, *post*) for a total credit of $10,511.20 for the Akin house only. However, as to the drainage and flatwork categories as well as all other architectural items (and emotional distress; see pt. II, *post*), no credit would be accorded because those categories are not adequately related to roofing.

section 1431.2, it as a joint tortfeasor will not be allowed any offset against any future judgment for these noneconomic damages for emotional distress, since that section now provides that liability for noneconomic damages should be several, rather than joint.[9] This change in the law "abolished the rule of joint and several liability for 'non-economic damages' as defined by subdivision (b)(2) of [Civil Code section 1431.2], and retained the joint and several liability rule for 'economic damages' as defined in subdivision (b)(1). [Citation.]" (*Espinoza* v. *Machonga* (1992) 9 Cal.App.4th 268, 272-273 [11 Cal.Rptr.2d 498], fn. omitted.) ▮ In addressing the proper setoff to be given a nonsettling defendant due to a settlement that includes both noneconomic and economic damages, the court in *Espinoza* v. *Machonga*, *supra*, explained: "Section 1431.2 provides that the responsibility for the noneconomic portion of the damages allocated to each defendant shall be several and not joint. Therefore, each defendant is solely responsible for his or her share of the noneconomic damages. Thus, that portion of the settlement attributable to noneconomic damages is not subject to setoff. To do otherwise would, in effect, cause money paid in settlement to be treated as if it was [*sic*] paid as a joint liability. This could not properly be done on a verdict and we see no basis why it should be done on a settlement." (*Espinoza* v. *Machonga*, *supra*, 9 Cal.App.4th at pp. 276-277.)

The court in *In re Piper Aircraft*, *supra*, 792 F.Supp. at pages 1191-1193, reached a similar conclusion by discussing the relationship of section 877, subdivision (a), and Civil Code section 1431.2. The court found no inherent conflict between the policy rationale of Civil Code section 1431.2 and the requirements of section 877, subdivision (a) for providing a setoff to a nonsettling tortfeasor against a future judgment, due to a preverdict settlement or award. The court stated, "Both statutes seek to ensure the fair apportionment of damages and the equitable distribution of loss." (*In re Piper Aircraft*, *supra*, at p. 1192.) The primary purpose of section 877, subdivision (a) is to reduce claims against other joint tortfeasors, but since the enactment of Civil Code section 1431.2, liability for noneconomic damages is not incurred jointly, but only severally. (*In re Piper Aircraft*, *supra*, at p. 1193.) The court thus construed section 877 as providing that no credit should be given to a nonsettling tortfeasor for a pretrial payment by

---

[9]Civil Code section 1431.2 was enacted as part of the Fair Responsibility Act of 1986, known as Proposition 51. (8 West's Civ. Code (1994 pocket supp.) § 1431, historical and statutory note, p. 58.) Civil Code section 1431.2, subdivision (a) provides as follows: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."

others in settlement of noneconomic damages claims. (*In re Piper Aircraft*, *supra*, 792 F.Supp. 1189.)[10]

■■■■ To analyze whether this allocation to the emotional distress category, operating to exclude this portion of the settlement from a setoff to the nonsettling defendants, was in good faith (*Knox* v. *County of Los Angeles*, *supra*, 109 Cal.App.3d at p. 837), we look to the factual and procedural background of this settlement. First, the plaintiffs pled theories of nuisance and negligent infliction of emotional distress against the developer, and the developer's efforts to have those claims disposed of by motion for summary adjudication were unsuccessful. The plaintiffs had also received instructions from the trial court that they had to find a creative way to try these claims, since the court was not going to allow each individual plaintiff to come to court and cry on the witness stand. At the settlement hearing, plaintiffs' counsel stated that such pressure by the trial court was one of the reasons that the plaintiffs agreed to settle these claims.

The availability of emotional distress damages in property damage cases is a subject of some dispute among the Courts of Appeal. (See, e.g., *Salka* v. *Dean Homes of Beverly Hills, Inc.** (Cal.App.); and *Cooper* v. *Superior Court* (1984) 153 Cal.App.3d 1008, 1012 [200 Cal.Rptr. 746].) Even assuming such a claim may properly be made in the construction defect context, it would arguably run only against the developer who had a "special relationship" of some kind with the homeowner who bought from the developer, and would not run against the subcontractor or design professionals.

The relevant inquiry on this point at the settlement stage, however, is not the enduring viability of a plaintiff's particular theory of recovery, but instead a reasonable evaluation of potential exposure to liability based on the circumstances of that case. Here, those circumstances included the denial of the motion for summary adjudication to strike those claims, as well as the court's comments on the potential trial problems for such claims.

Of course, emotional distress damages are extremely subjective and individualistic in nature, and the settlement allocation of $15,000 per home for

---

[10]The particular settlement procedure used in *In re Piper Aircraft*, *supra*, 792 F.Supp. 1189, a factually complex case, involved the efforts of a special master to take evidence and make factual determinations of economic and noneconomic damages amounts. Regan Roofing argues such an evidentiary hearing procedure is required here. However, the reasoning of *Piper* does not hinge upon the particular fact-finding procedure used there, and we decline to require a minitrial on the valuation of such damages in settlement. (See *Abbott Ford*, *supra*, 43 Cal.3d at pp. 879-880, fn. 23.)

*Reporter's Note: Review granted December 30, 1993 (S035772); review dismissed July 28, 1994, and cause transferred to Court of Appeal, Second Appellate District, Division Four.

emotional distress is admittedly somewhat arbitrary in nature. However, such arbitrariness does not destroy the good faith of such a settlement offer, so long as it is within the reasonable range of potential liability for that claim. The fact that an opposed motion on this precise issue had been brought to hearing shows that the parties were adverse in interest on this issue, and their valuation of this particular settlement component thus should be given a presumption of reasonableness. (*Abbott Ford, supra,* 43 Cal.3d at p. 879.) In evaluating the parties' good faith in reaching this allocation of settlement proceeds, the trial court was required to use its discretion and its expertise, and was required to make a factual finding that such an award was reasonable. On substantial evidence review of such a decision, we cannot say this record lacks a solid basis for the approval of the settlement in this regard, even though it operates to reduce the amount of setoff available to the nonsettling defendants to that extent. (*Espinoza* v. *Machonga, supra,* 9 Cal.App.4th at pp. 276-277.) Because this evaluation was made at settlement negotiations, no evidentiary hearing or minitrial is required on the valuation issue. (*Abbott Ford, supra,* at pp. 879-880, fn. 23; see *In re Piper Aircraft, supra,* 792 F.Supp. at pp. 1191-1193.) The petition is not persuasive on this issue.

## III

### *Investigative Costs and Litigation Expenses*

This category of settlement consideration consists of $250,000 for expert fees incurred as investigation costs concerning the discovery of defects at the plaintiffs' residences, and $132,184.26 as litigation expenses.[11] Regan Roofing objects to this form of settlement consideration, contending there is no evidence to support such an allegation into these categories, and complaining that there will be no fair offset accorded to the nonsettling defendants from these categories. In support of its claims, Regan Roofing argues that since this is a pretrial settlement, there is as yet no prevailing party under section 1032 and, further, that under the costs statute (§ 1033.5, subd. (b)(1) & (2)), it is not proper to award as costs "[f]ees of

---

[11]The litigation expenses which make up this category of settlement consideration were set forth by the plaintiffs' attorney in his declaration as follows:

| | |
|---|---|
| Filing and motion fees | $ 352.20 |
| Deposition costs | $ 54,759.75 |
| Service of process | $ 2,384.21 |
| Witness fees (Defendants deposition fees) | $ 12,155.82 |
| Models, blowups, photocopies of exhibits | $ 54,989.22 |
| Total | $132,184.26 |

experts not ordered by the court" or "[i]nvestigation expenses in preparing the case for trial." (§ 1033.5, subd. (b)(1) & (2).) We shall discuss the two categories of costs separately.

First, on the $250,000 in experts' fees allocated to the investigation costs category, the record shows that plaintiffs' attorney's declaration states that that amount represents less than one-half of plaintiffs' total expert expenses to date. Although at first glance it seems that section 1033.5, subdivision (b)(1) would not permit an award of costs for such non-court-ordered expert fees, it must be remembered that this is a pretrial settlement allocating settlement consideration into various categories. It would be proper to view this $250,000 expert expense as damages due for a portion of the cost of repair, which is an appropriate measure of damages in cases based on damage to real property. (Civ. Code, § 3333; *Raven's Cove Townhomes, Inc.*v. *Knuppe Development Co.* (1981) 114 Cal.App.3d 783, 801-802 [171 Cal.Rptr. 334]; see 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1462, pp. 934-935; *Orndorff* v. *Christiana Community Builders* (1990) 217 Cal.App.3d 683, 690 [266 Cal.Rptr. 193]; also see *Carlson Industries* v. *E. L. Murphy Trucking Co.* (1985) 168 Cal.App.3d 691, 694 [214 Cal.Rptr. 331].)

In any case, a party's forbearance from seeking an award of litigation costs may constitute legal consideration for settlement. (*Armstrong World Industries, Inc.* v. *Superior Court* (1989) 215 Cal.App.3d 951, 957 [264 Cal.Rptr. 39].) Here, the trial court expressly found that the investigative costs figure was in the *Tech-Bilt* ballpark as recoverable costs. To evaluate that determination by the trial court, we need not make an in-depth survey of the law of costs vis-à-vis damages for such an allocation. Instead, the proper inquiry at the good faith settlement approval stage is whether this particular item of settlement consideration had a reasonable evidentiary basis and was reached in an atmosphere which was appropriately adversarial to give rise to the presumption that a reasonable valuation was reached. This portion of the settlement meets those standards.

■ Moreover, we do not understand why Regan Roofing argues that it would not be entitled to an offset for this particular item of settlement consideration, or for its companion, the litigation costs. In the developer's and plaintiffs' response to this petition for writ of mandate, they concede there is little question that the nonsettling parties would receive an offset for the costs as allocated, based upon the trial court's statement at the hearing that it would not allow double recovery through this settlement. Like any other intangible settlement asset, costs and expenses are not necessarily tied to a particular defendant unless stated otherwise, since the plaintiffs incurred these expenses in prosecuting their case as a whole. These particular settlement items do not represent noneconomic damages such as would be subject

to the rule of Civil Code section 1431.2 (see pt. II, *ante.*) Nor does the fact that there has been no trial, and no formal costs award has yet been made, mean that an appropriate offset could not be allowed for these expenses paid in settlement. (*Armstrong World Industries, Inc.* v. *Superior Court, supra,* 215 Cal.App.3d at p. 957.) Such an offset would be pro rata, according to the number of nonsettling defendants, for purposes of setting the credit.

 On the issue of recoverable court expenses, nothing more need be said other than one of the costs items identified in the plaintiffs' attorney's declaration, i.e., "[m]odels, blow-ups, and photocopies of exhibits" (a $54,989.22 item) might appear to be a questionable cost item in light of section 1033.5, subdivision (a)(12), allowing models and blowups of exhibits and photocopies of exhibits as costs "if they were reasonably helpful to aid the trier of fact." Of course, no trier of fact has ever had the opportunity to assess the strength of the plaintiffs' case before this pretrial settlement was reached. However, plaintiffs were justified in preparing the case as though it were going to trial, and the fortuity of a pretrial settlement with the developer should not defeat the plaintiffs' right to recover these cost items in settlement. (*Armstrong World Industries, Inc.* v. *Superior Court, supra,* 215 Cal.App.3d at p. 957.) In conclusion, these items of settlement consideration were properly evaluated by the trial court as having an adequate evidentiary basis and as being entitled to the presumption of reasonable valuation. Thus, the petition has no merit in this respect.

IV

*Assignment of Indemnity Rights*

A

*Factual Background*

For purposes of settlement, counsel for plaintiffs and the developer valued the assignment of the developer's causes of action for indemnity at $5,000. Such indemnity could possibly be sought against all of the cross-defendants, which includes most of the nonsettling defendants.[12] The potential recovery that such an indemnity cause of action could represent would be the $2 million in settlement consideration paid by the developer (not including the $5,000 valuation for this assignment of rights). At the hearing on the good faith of the settlement, the court and counsel discussed the $5,000 valuation

---

[12]Regan Roofing is a cross-defendant as well as a defendant; however, petitioner Vince Ramirez doing business as Pacific Rebar is only a cross-defendant, not having been named in plaintiffs' complaint.

placed upon this assignment of rights, and essentially concluded that figure was somewhat arbitrary; plaintiffs would stipulate that the assignment of rights was worth nothing, but stated that $5,000 seemed to be as fair an estimate as any. In the developer's opposition filed to the various objections to the good faith settlement, the reason given for the low valuation of the assignment of rights was first, that the plaintiffs had their own direct action against most of the subcontractors pending, so that the cross-complaint rights were not that valuable in comparison and, second, none of the subcontractors had agreed to defend and indemnify the developer under the contractual indemnity clauses, and had not as yet acknowledged that the indemnity rights had any value. The subcontractors continued to blame the developer's accelerated construction schedule for the bulk of the construction defects at the property.

## B

### Settlement Consideration: Double Recovery Issues

It is well settled that an assignment of indemnity rights may constitute valuable noncash consideration for settlement. (*Southern Cal. Gas Co.* v. *Superior Court, supra,* 187 Cal.App.3d at pp. 1034-1037.) The value of such assigned rights may be determined at the time of settlement by declaration or by expert testimony. (*Id.* at p. 1036.) Alternatively, a credit in favor of nonsettling defendants for any amounts eventually recovered by the plaintiffs through the assigned rights may be ordered, as long as the assigned rights (e.g., versus an insurer on bad faith theories) are required to be pursued with due diligence. (*Ibid.*)

In *Alcal, supra,* 8 Cal.App.4th 1121 at page 1128, the court spoke about the assignment by the developer of its indemnity rights against the roofer to the plaintiff, and stated that without added information it could not determine "whether the assigned rights merely duplicated [plaintiff's] existing rights against roofer." To expand upon this concept here, some possibility of "double recovery" on approval of partial settlements may arise potentially in several contexts. Principally, the problem is discussed in terms of double recovery somehow resulting from a contractor's or developer's assignment of indemnity rights to the plaintiff. The typical situation, illustrated by this case, is that defects in construction may have been caused, and usually are alleged to have been caused, by the negligence of the general contractor as well as the negligence of subcontractors or designers. Typically, as in this case, the general contractor will have included indemnification provisions in the contracts by which he engaged the subcontractors and designers. Depending on the nature of these contractual provisions, the indemnitor may be

liable only for indemnification for damage caused by his own negligence, or he may also undertake to indemnify the general contractor as to its negligence. (See *Peter Culley & Associates* v. *Superior Court, supra,* 10 Cal.App.4th at p. 1492.) Further, once cross-complaints are filed, equitable indemnity may also be alleged, e.g., by the general contractor.

In any event, to the extent that the contractor or developer has a contractual or equitable right of indemnity against a subcontractor, it constitutes a claim for reimbursement of damages the contractor or developer will have incurred in favor of a plaintiff. If as part of a settlement with the plaintiff the contractor assigns its indemnity rights, the plaintiff then has two theories of recovery from subcontractors: the first may be based upon the subcontractor's own active negligence which damaged the plaintiff; the second is based upon the contractor's assigned rights of indemnity. This dual possibility of recovery has caused courts to ruminate about the possibility of "double recovery." (See, e.g., *Alcal, supra,* 8 Cal.App.4th at p. 1128.)

In *Erreca's, supra,* 19 Cal.App.4th at pages 1502-1503, we were presented with an argument that the improper valuation of assigned indemnity rights would lead to double recovery. We dealt at some length with the issue, concluding that because the direct cause of action against a subcontractor and that derived from the assignment of indemnity rights were separate causes of action, "double recovery" should not be a concern. (*Id.* at pp. 1503-1504.) We explained that the assignment of such rights should properly be viewed "as the transfer of a valuable asset in consideration of settlement which should be treated like any other valuable asset (e.g., cash, securities, real property, or assignment of a different type of indemnity rights, such as a bad faith cause of action against an insurance carrier) for purposes of setting a credit. Such assignment of indemnity rights merely represents the assignment of a particular variety of chose in action, which may be transferred and recovered upon without violation of any public policy of which we are aware. [Citation.]" (*Id.* at p. 1503.)

██ To avoid double recovery problems in this difficult area, we admonished trial courts to give close attention to the proper valuation of the assigned chose in action, and emphasized the importance of requiring (1) an adequate evidentiary basis for each allocation of settlement consideration to a particular area of damages for which the nonsettlors are claimed to be liable, (2) a showing that the allocation was reached in negotiations of an appropriately adverse nature to give rise to a presumption of reasonable

valuation, and (3) an accurate award of credit to the nonsettlors in connection with the good faith settlement approval. (19 Cal.App.4th at p. 1504.) The value placed upon such an assignment of rights should be credited as against any eventual judgment against the nonsettlors on the same claims as were settled by the settling parties, i.e., plaintiffs' direct action, not any indemnity recovery through the assignment of rights. (*Id.* at p. 1503.) This procedure, we said, should "adequately resolve [ ] concerns about potential double recovery for purposes of ascertaining if the settlement reached was in good faith." (*Id.* at p. 1504.)

Upon continued reflection, we confirm our initial approach to this matter in *Erreca's* was sound, as there is no possibility of "double recovery" under these circumstances. The direct action for negligence and the derivative action for indemnity constitute wholly independent rights. A plaintiff who recovers for negligent soils compaction directly from the soils subcontractor and who then recovers additional sums from that subcontractor by way of the assignment of the contractor's indemnity rights has not recovered twice, and the subcontractor has paid only once. This is because any indemnity recovery is based upon making the contractor whole for what *he* has paid the plaintiff. If the plaintiff profits it is not because the subcontractor has paid twice, but because the plaintiff purchased the chose in action from the contractor at a good price.[13] Accordingly, such accusations of "double recovery" obtained by a plaintiff who purchases an indemnity claim at a discount miss the mark. There is no double recovery and we should not worry about it.

---

[13]Let us consider an example of the above. Assume total soils damage of $500,000, all caused by the subcontractor's negligence. The contractor, liable for the same damage, settles with the plaintiff for $300,000 and assigns his indemnity rights against the subcontractor. These rights are valued at the good faith settlement hearing at $100,000. In accordance with our *Erreca's* opinion, the subcontractor is then entitled to a $400,000 credit against any subsequent judgment in favor of the plaintiff. If the plaintiff recovers a full $500,000 judgment, the subcontractor will thus owe an additional $100,000. If the plaintiff then recovers $300,000 in full recognition of the assigned indemnity agreement, plaintiff will have obtained a total of $700,000 ($300,000 from the contractor which resulted from the settlement, $300,000 from the subcontractor based on the assigned indemnity agreement, and an additional $100,000 as the difference between the negligence judgment of $500,000 and the credit of $400,000). There is no duplicate recovery, however: the extra $200,000 represents the benefit to the plaintiff of making a good bargain in purchasing the contractor's indemnity rights. It is to be noted that this transaction imposes no unjust consequences upon the subcontractor: he has been found liable for damage in the sum of $500,000 and he has paid only $400,000 ($300,000 by way of the indemnity claim and the $100,000 difference between the $500,000 judgment and the $400,000 credit). The subcontractor, in fact, has benefited from the assignment process, the result of which was to reduce his obligation, somewhat gratuitously, by virtue of the $100,000 valuation of the chose in action.

## C

### *Application of Authority*

In evaluating the appropriateness of the parties' valuation of this type of assignment of indemnity rights as a settlement contribution, we apply the same standards for determining the good faith of the valuation as in any other allocation of settlement monies. Specifically, the trial court should examine whether there is an adequate evidentiary basis for the valuation and whether it was reached in an atmosphere of such adverseness as to give rise to the presumption that a reasonable valuation was made. (*Erreca's, supra,* 19 Cal.App.4th at pp. 1495-1496.) The trial court will then apply its discretion in determining whether the parties' showing is adequate. The settlement components should all represent an amount within the reasonable range of liability of the settling defendant. (*Id.* at pp. 1496-1497.) Although valuation of any settlement asset must necessarily include some estimation and extrapolation, the valuation of assigned indemnity rights should normally be made at the time of settlement as part of the overall good faith showing for the settlement. (*Southern Cal. Gas Co., supra,* 187 Cal.App.3d at p. 1036.)[14] Finally, an appellate court reviewing such a determination by the trial court should apply the substantial evidence standard to the factual determinations made by the trial court. (*Toyota Motor Sales U.S.A., supra,* 220 Cal.App.3d at p. 871.)

What, then, are the criteria which should be applied when an expert or the parties in their declarations set forth a value for such an assignment of rights? In *Erreca's, supra,* 19 Cal.App.4th at pages 1497-1499, we discussed three particular criteria to be considered in such a valuation. Considering the maximum entitlement to indemnity that the assignment represents, the parties may then assign a discount to that maximum entitlement based on the cost to prosecute the claims, the probability of prevailing on them, and the likelihood of collecting on a judgment on them. It might be more difficult, for example, to prove negligence rather than strict liability in connection with an assigned indemnity right. The extent of the assignor's potential comparative fault might serve to reduce the value of the assignment. It could also be considered whether the assignees had any intention of actually pursuing such indemnity right, or whether they preferred to pursue only their own direct rights.

Simply because the potential indemnitors have as yet refused to provide a defense or indemnity to the assignor of the indemnity rights is no reason to

---

[14]Alternatively, the trial court may decline to set a value on the assignment of rights for credit purposes, but may require the assignees to pursue the assigned rights with due diligence in order to receive good faith settlement approval. (*Southern Cal. Gas Co., supra,* 187 Cal.App.3d at p. 1036.) We note, however, that the latter procedure poses a risk of substantial delay in the final resolution of the entire case.

assume that such rights are inherently valueless. Similarly, because indemnity rights represent a different primary right than the direct claim of the plaintiffs, there is not necessarily any duplication between these two causes of action. (See *Alcal*, *supra*, 8 Cal.App.4th at p. 1128; *Erreca's*, *supra*, 19 Cal.App.4th at pp. 1503-1504.) Although no firm guidelines can be established as to the proportional value of an assignment of rights as compared to the potential recovery that it represents, that proportion should not represent "peanuts" in order to be within the *Tech-Bilt* ballpark. (*Tech-Bilt*, *supra*, 38 Cal.3d at p. 499.) Because a proper valuation of the indemnity rights is necessary to accord appropriate credit to the nonsettling defendants against any eventual plaintiffs' judgment that they may suffer, more than guesswork or arbitrary choice of a particular value is required.

In *Erreca's*, we found that a 20 percent assignment of rights valuation was supported by the proper evidentiary showing. ■ Here, the $5,000 valuation of this potential $2 million indemnity claim represents .0025 percent of the potential indemnity recovery. All we have in support of the valuation is plaintiffs' counsel's letter stating that the $5,000 valuation had been reached, without supporting evidence or explanation, and an offered stipulation at the hearing that these indemnity rights are completely valueless. We have been given no information about the additional cost to plaintiffs to prosecute these indemnity claims against the 22 nonsettling defendants, any probability of prevailing on them, or any likelihood on collecting on a judgment on them. It may be that the $5,000 valuation represents an accurate assessment when all the relevant factors are considered. However, without more information about the assignment value, we are unable to make a reasoned evaluation of it.

On this particular point, therefore, the petition for writ of mandate has merit. The trial court will not, however, be required to set aside this entire good faith settlement because of this defect, if it takes appropriate remedial action. We remand the matter for the trial court to receive and consider evidence about the appropriate valuation of this assignment of rights. It may be that the total settlement consideration changes or remains the same. We determine only that this settlement in this form does not currently contain an adequately supported valuation of the assignment of indemnity rights.

### DISPOSITION

The petition is granted with directions to the trial court to vacate its ruling approving the settlement unless the trial court receives and considers evidence enabling it to set an accurate valuation of the assignment of rights, for purposes of setting an appropriate credit for the nonsettling defendants.

Todd, Acting P. J., concurred.

**FROEHLICH, J.**—I concur in the majority opinion in all respects. I write separately both to highlight difficult aspects of the majority and to voice reservations as to certain inferences which might be made from it. The central theme I derive from the majority opinion is that settlements are to be encouraged; partial settlements of multiparty construction defect cases will not occur unless the settling defendants can achieve the good faith settlement insulation against later claims which is provided by Code of Civil Procedure[1] section 877.6; determining whether a settlement is "within the ballpark" is highly subjective and cannot be a matter subject to significant precision; and that if the trial court evidences *its* own good faith and industry in terms of an independent evaluation of allocations made by the settling parties, its exercise of discretion will not be disturbed. The trial court did that in this case (except for its treatment of the value of the assignment of indemnity rights) and hence we affirm that decision.

Our affirmance confirmed a substantial allocation of settlement proceeds to "emotional distress damage." We also affirmed the position we took in *Erreca's* v. *Superior Court* (1993) 19 Cal.App.4th 1475 [24 Cal.Rptr.2d 156] (hereafter *Erreca's*) requiring a reasonable valuation of the chose in action constituting an assignment of indemnity rights. I wish to comment on these two facets of the majority opinion.

## I. *Valuing the Assignment of Indemnity Rights*

There seems now no dispute about the proposition that to be in "good faith" an approved settlement must value and allocate all elements of the settlement (see *Southern Cal. Gas Co.* v. *Superior Court* (1986) 187 Cal.App.3d 1030, 1036 [232 Cal.Rptr. 320]; *Erreca's, supra,* 19 Cal.App.4th at p. 1500.) Our recent *Erreca's* opinion, among others (*Alcal Roofing & Insulation* v. *Superior Court* (1992) 8 Cal.App.4th 1121 [10 Cal.Rptr.2d 844] being foremost) makes it clear that the assignment of indemnity rights constitutes the transfer of an asset which must be valued and an accounting therefor rendered in the credit allocation to nonsettling defendants. In light of the specific requirements for credit contained in section 877, subdivision (a), this conclusion is difficult to challenge. The unusual nature of the chose in action for indemnity gives rise, however, to most peculiar practical problems associated with valuation. I will first review some of the practical problems of valuation, and then will conclude with the recommendation that we would be better off (notwithstanding our recent stance to the contrary) allocating no value to the assignment.

The first difficulty arises from the nonadversarial setting in which the value is achieved. This case appears to be typical of the problem. A

---

[1]All statutory references are to the Code of Civil Procedure unless otherwise specified.

monetary consideration is established for the principal settlement payment which, as in this case, constitutes close to the maximum the general contractor or developer has the capacity (whether by reason of lack of insurance coverage or otherwise) to pay. One of the seriously motivating factors impelling settlement is the contractor's ability thereby to terminate litigation costs. While the contractor may have a good cause of action for indemnity against subcontractors, its frame of mind is not conducive to continued litigation. The chose in action represented by its indemnity claim is therefore not uppermost in its mind as a bargaining chip. Adverse negotiating positions do not exist, and the valuation put on the chose in action does not, therefore, achieve the status of presumptive correctness. (*Peter Culley & Associates* v. *Superior Court* (1992) 10 Cal.App.4th 1484, 1498 [13 Cal.Rptr.2d 624].)

From the plaintiff-assignee's point of view there is everything to gain and nothing to lose by determining a low value for the assignment. If a value is to be allocated to the assignment, it must be set at the time of the settlement, and should not be delayed until a later date. The suggestion that valuation can be delayed until recovery is realized on the indemnity claim (made in *Southern Cal. Gas Co.* v. *Superior Court, supra*, 187 Cal.App.3d 1030, 1036) is unworkable. Not only would such a course of action deprive the remaining nonsettling parties of credit knowledge necessary for intelligent settlement negotiations, but it would effectively nullify any benefit the plaintiff might derive by the assignment. If nonsettling defendants are to receive full credit for whatever they ultimately pay as the result of the indemnity claim, the plaintiff is precluded from profit by way of his acceptance of the assignment.[2]

There are other problems with the accepted treatment of indemnity assignments. The policy underlying the good faith settlement release provisions of section 877 et seq. is that settlements should be encouraged, and can be sufficiently encouraged only by immunizing the settling defendant from further litigation among his codefendants. The deprivation of the cross-complaint rights of the codefendants is justified by the requirement that they obtain credit, as an offset to any final judgment against them, for the amounts paid by the early-settling defendant. (*Abbott Ford, Inc.* v. *Superior Court* (1987) 43 Cal.3d 858, 873 [239 Cal.Rptr. 626, 741 P.2d 124]; Roberts, *The Good Faith Settlement: An Accommodation of Competing Goals* (1984) 17 Loy.L.Rev. 841, 891.) Hence it is necessary to credit the nonsettling

---

[2]Referring to the example contained in footnote 13 of the majority opinion, if the value of the indemnity claim were postponed until it was realized, the subcontractor would receive a $300,000 credit for it, which coupled with the $300,000 already received by plaintiff based upon the contractor's cash payment would exceed the $500,000 liability.

defendant with the amount paid by the settlor, to the extent payment relates to the claim for which the two are jointly liable.

The problem with applying this principle to the assignment of indemnity rights is that any alleged or actual defect in the rights theoretically should work to the advantage of the subcontractor (such defects as denial of coverage, refusal to provide a defense, lack of insurance coverage, insolvency of the subcontractor, etc.). However, the more defects asserted by the subcontractor, the less valuable the right would appear at the time of its assignment, resulting in reduction of the ultimate credit to the nonsettling subcontractor. His final liability, therefore, is increased by factors which otherwise would work to lessen it. The reverse of this picture would be that of the solvent subcontractor with good insurance who can likely pay the ultimate indemnity claim. This will increase the valuation of the claim at the time of the good faith settlement, resulting in a greater credit against the plaintiff's judgment and hence a lower net payment by the subcontractor.[3]

A reasonable argument can be made that the illogic of these theories would be rectified by the adoption of a rule denying *any* credit for assignment of indemnity rights. The subcontractor will get credit for all cash payments (or any consideration other than the indemnity assignment) made to the plaintiff. That same sum will measure the maximum obligation he may have to pay in indemnification of the contractor. In the example we have been using the judgment of $500,000 would be reduced by the $300,000 cash paid by the contractor, for a net obligation to the plaintiff of $200,000. If the subcontractor is then required to pay $300,000 in indemnity, he has simply paid the amount he justifiably owes: $500,000. By giving credit for the assumed value of the indemnification rights we greatly skew and confuse the transaction.

The reason for this somewhat unexpected and seemingly unintended credit computation is that the item providing the credit is not a typical asset, and not even a typical chose in action. It is a chose in action which has a mirror image—a double effect. To the extent it is valued it results (as per our *Erreca's* opinion) in a credit to the subcontractor against any claim of the plaintiff; but to the extent it is *realized* in the plaintiff's action the credit vanishes. If the chose in action is valued at its full potential, or as suggested in *Southern Cal. Gas Co.* v. *Superior Court, supra*, 187 Cal.App.3d 1030, at

---

[3]Using the figures from our hypothetical settlement in footnote 13 of the majority opinion: If the value of the indemnity claim be raised from $100,000 to $200,000, the subcontractor receives a credit of $500,000 against plaintiff's judgment (the $300,000 paid by the contractor and the $200,000 valuation of the assignment) and pays only the $300,000 related to the separate indemnity claim.

its ultimate figure of recovery, the subcontractor receives an unmerited benefit because he gets a "double" credit (a credit for the cash settlement by the contractor and an identical credit for the chose in action). In such situation the subcontractor winds up paying only the indemnity claim.[4]

If, on the other hand, the assigned claim should be valued at zero, the subcontractor receives no credit for the claim as against the plaintiff's direct recovery, and also of course no credit in terms of the plaintiff's recovery based on the assigned claim. Thus, in the example previously used, if the recovery is $500,000 and no credit value is given to the assigned claim, the subcontractor pays $200,000 as the balance of the direct judgment (the $500,000 judgment less the $300,000 credit for the contractor's cash payment) and also is liable for $300,000 to satisfy the assigned indemnity claim. The subcontractor has been found liable for $500,000 in damages and he has paid $500,000 in damages—no injustice has resulted.[5]

In summary: To the extent the assigned indemnity claim is given a value in the section 877.6 hearing it is productive of unjustified reduction of the plaintiff's recovery and unwarranted limitation on the subcontractor's liability. If the assigned indemnity claim is given no value, the plaintiff then has the potential of full recovery and the subcontractor must face the prospect of full liability. That latter result seems to be what we should be seeking. We have not said this in any of the authorities cited herein, and most particularly we did not say it in our recent opinion in *Erreca's*. We are bound to follow clear precedent and hence do not now depart therefrom, at least so early in this game. If these views are found by others to have any merit, however, perhaps future wisdom will work a change in direction in this abstruse and challenging area of settlement law.

## II. *Valuation of Emotional Distress Damage*

The trial court approved, and we have accepted, an allocation of $360,000 for noneconomic damages identified as emotional distress. I am concerned about this allocation because it appears to be one which deprives the

[4]In our previous example, assuming total damage of $500,000 and a cash payment by the contractor of $300,000, with an assignment of the indemnity claim which is valued at $300,000, the subcontractor receives a $600,000 credit against any plaintiff direct recovery and pays only the claim based upon the indemnity chose in action, or $300,000, thus inequitably benefiting from the full valuation of the assigned claim.

[5]It is to be noted, respecting this example, that the subcontractor presumably has also not been cheated of any benefit he otherwise might seek from the early-settling contractor. In assertion of the indemnity claim the plaintiff is subject to any defense the subcontractor might have against the contractor, and hence when we hypothetically assume a full recovery on the indemnity claim we have posited a situation in which the subcontractor has no defense to the claim.

subcontractors of a potential for credit, since Civil Code section 1431.2 provides that "liability for non-economic damages shall be several only and shall not be joint."[6] Assuming the essentially nonadversarial nature of the allocation of settlement proceeds, as I have discussed above, there would be every reason to overload consideration into this "emotional distress" category. Since all that is required is a "ballpark" result, there will be a tendency to deprive subcontractors of credits.

There is, however, a more fundamental defect in this allocation of settlement proceeds to emotional distress damage. I realize that in this case the defendants had made and lost motions for summary judgment designed to remove emotional distress claims from the case. These claims therefore were ripe for presentation at trial and constituted bona fide bargaining chips to which value was properly allocated. My concern with this is that these claims should *not* have survived summary judgment and hence should not have been available for allocation of value. My distress with the majority opinion is that it gives credence to very recent case authority approving an award of emotional distress damage in a construction defect case (see maj. opn., *ante*, p. 1707, where the majority references a "dispute" as to the availability of such damage).

The cited case is *Salka* v. *Dean Homes of Beverly Hills, Inc.*\* (Cal.App.). Perhaps my concern is unwarranted, since the Supreme Court has now granted review of this decision (Dec. 30, 1993 (S035772)). However, in my opinion the Court of Appeal's decision in the case is wrong and by citing it (even noting the Supreme Court's pending review) in a published opinion without adverse comment we give it dignity.

*Salka* was a claim, pure and simple, for construction defect damages. Improper grading and soils compaction caused flooding, standing water, dampness in the house and resulting damage to floors and walls. The trial was conducted before a referee, who found damage in terms of cost of repair and diminution in value, and in addition made an award of $50,000 for emotional distress. On appeal the emotional distress award was affirmed on the ground that since people's homes are their most important investment and pertain to their personal living arrangement, it is clearly foreseeable that

---

[6]Exactly how this concept would work in practice is difficult to predict. Each plaintiff in this case received an allocation for emotional distress of some $15,000. In a subsequent direct action against subcontractors how could this previously received compensation not be considered? Could not the defendant demand an instruction requiring the jury to determine the total amount of emotional distress experienced by the plaintiff homeowner and the portion thereof caused by the particular defendant's actions? If a jury then evaluated the total as identical to the subcontractor's misconduct, would not the court be obliged to reduce the award by the amount previously paid?

\*Reporter's Note: Review dismissed July 28, 1994, and cause transferred to Court of Appeal, Second Appellate District, Division Four.

a negligently caused defect in the home will result in emotional distress. The *Salka* court thus focused solely upon foreseeability as the key to liability, ignoring considerable persuasive authority which excludes emotional distress as a component of damage in property damage cases.

The clear authority in the field is *Cooper* v. *Superior Court* (1984) 153 Cal.App.3d 1008 [200 Cal.Rptr. 746], which states flatly that there is "[n]o . . . recovery for emotional distress arising solely out of property damage, absent a threshold showing of some preexisting relationship or intentional tort." (*Id.* at p. 1012.) While the *Cooper* court recognized that "emotional distress arising out of loss of property evokes a sentimental loss" (in that case damage to a home caused by a runaway tractor), it refused to countenance a recovery of damages on policy grounds, advising that "reasonable limitations on the extent and remoteness of a defendant's liability must be maintained." (*Id.* at p. 1013.) *Cooper* is cited with approval in 6 Witkin, Summary of California Law (9th ed. 1988) Torts, section 856, pages 218, 219, the text adding that "No California case has allowed recovery for emotional distress arising solely out of property damage, unless there was a threshold showing of some preexisting relationship or intentional tort."

My research confirms Mr. Witkin's conclusion. In *Smith* v. *Superior Court* (1992) 10 Cal.App.4th 1033 [13 Cal.Rptr.2d 133] (a legal malpractice case in which emotional distress damages were sought) the court affirmed that "mere negligence will not support a recovery for mental suffering where the defendant's tortious conduct has resulted in only economic injury to the plaintiff." (*Id.* at p. 1040.)[7] Our own court in *Branch* v. *Homefed Bank* (1992) 6 Cal.App.4th 793 [8 Cal.Rptr.2d 182] restated the rule originally set forth in *Quezada* v. *Hart* (1977) 67 Cal.App.3d 754 [136 Cal.Rptr. 815], that damages for emotional suffering are limited to cases involving either physical impact and injury to the plaintiff or intentional wrongdoing by the defendant. (*Branch* v. *Homefed Bank*, *supra*, at p. 800) We reiterated this position in *Devin* v. *United Services Auto Assn.* (1992) 6 Cal.App.4th 1149, 1162 [8 Cal.Rptr.2d 263], stating that ". . . it is the general rule that negligence which causes only monetary harm does *not* support an award of emotional distress damages." (Italics in original.)

The defect in the *Salka* approach, in my opinion, is that it makes recovery dependent upon a factual determination of just how great the worry, consternation and distress over the event may be, or may be foreseen to be, as it

---

[7]In footnote 1 on the same page 1040 the *Smith* court indicates that its rule would be even more restrictive than that stated in *Cooper*, saying that "To the extent *Cooper* stands for the proposition the mere existence of a preexisting relationship suffices to support recovery for mental suffering where another's negligent conduct results in only economic injury, we disagree and decline to follow it."

affects a particular plaintiff. It is interesting to note that the referee in *Salka* awarded damages to plaintiff wife but none to plaintiff husband. Thus, apparently, a potential defendant must not only consider the objectively foreseeable consequences of his negligence, but also must conform that consideration to variable subjective consequences which will depend upon the sensitivity of a particular future plaintiff.

This philosophy is not, I contend, in harmony with the current policy trend in this field set forth by the Supreme Court. The clearest enunciation of this is found in *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814]. In discussing policy limitations on negligence recoveries the court said ". . . it is clear that foreseeability of the injury alone is not a useful 'guideline' or a meaningful restriction on the scope of the [negligent infliction of emotional distress] action. . . . It is apparent that reliance on foreseeability of injury alone in finding a duty, and thus a right to recover, is not adequate when the damages sought are for an intangible injury. In order to avoid limitless liability out of all proportion to the degree of a defendant's negligence, and against which it is impossible to insure without imposing unacceptable costs on those among whom the risk is spread, the right to recover for negligently caused emotional distress must be limited." (*Id.* at pp. 663-664.)

The *Salka* court's emphasis upon the peculiarly sensitive nature of reaction to damage to one's home will not, I suggest, provide any reasonable limitation to claims for emotional distress damages. Particularly if the entitlement to damage is to be measured by the subjective reaction of the plaintiff, there is no limitation to the situations in which emotional distress of a severe nature can be foreseen from a defendant's conduct. Those of us presently or formerly in the practice of law know only too well how distressed a client can become over his attorney's mistake. The loss of a family business certainly can be as distressing as damage to one's home. Similar examples are limitless. As we said in *Branch* v. *Homefed Bank*, *supra*, 6 Cal.App.4th at page 801, "The consequential injury resulting from economic loss in terms of emotional distress is not compensable. Recovery for worry, distress and unhappiness as the result of damage to property, loss of a job or loss of money is not permitted when the defendant's conduct is merely negligent. As has been stated elsewhere, 'emotional distress is but "part of the human condition." ' [*Fuentes* v. *Perez* (1977) 66 Cal.App.3d 163, 169 [136 Cal.Rptr. 275].] Loss by anyone of property or money, and certainly loss of expected wages, will normally produce mental anguish. ' "Complete emotional tranquillity is seldom attainable in this world" ' [*ibid.*, quoted in *Quezada* v. *Hart* (1977) 67 Cal.App.3d 754, 762 (136 Cal.Rptr. 815)] . . . . Recovery for the inevitable distress resulting from finding

oneself the victim of a negligent tortfeasor is, however, limited to economic loss unless malice, breach of a fiduciary duty, physical injury or impact, or some other unusually extreme or outrageous circumstance, can be shown." (*Branch* v. *Homefed Bank, supra,* at p. 801.)

It is hoped that our majority opinion will not be taken as inferential acceptance of a doctrine of potential recovery of emotional distress damages in cases based on economic losses, and I write this portion of my concurring opinion principally to make sure that it will not.

APPENDIX A

E X H I B I T "A"
SETTLEMENT CONSIDERATION
ON A PER HOME BASIS

| Individual Homes | Allocation for Emotional Distress | Percent (%) of Allocation Per Home | Settlement Amount Less Emotional Distress | Allocation for Investiga-tional Costs | Allocation for Litigation Costs |
|---|---|---|---|---|---|
| Adams | $15,000.00 | 3.5 | $57,575.00 | $ 9,750.00 | $ 4,626.44 |
| Akin | $15,000.00 | 4.1 | 67,445.00 | 10,250.00 | 5,419.60 |
| Bayard | $15,000.00 | 3.7 | 60,065.00 | 9,250.00 | 4,890.02 |
| Berg | $15,000.00 | 4.2 | 69,090.00 | 10,500.00 | 5,551.74 |
| Browne | $15,000.00 | 4.1 | 67,445.00 | 10,250.00 | 5,419.56 |
| Butzinger | $15,000.00 | 4.0 | 65,800.00 | 10,000.00 | 5,287.36 |
| Chatham | $15,000.00 | 5.1 | 83,895.00 | 12,750.00 | 6,741.40 |
| Chauhan | $15,000.00 | 5.0 | 82,250.00 | 12,500.00 | 6,609.20 |
| Dowling | $15,000.00 | 4.8 | 78,960.00 | 12,000.00 | 6,344.85 |
| Finkelstein | $15,000.00 | 3.8 | 62,510.00 | 9,500.00 | 5,023.00 |
| Hughes | $15,000.00 | 4.6 | 75,670.00 | 11,500.00 | 6,080.48 |
| Jackson | $15,000.00 | 4.5 | 74,025.00 | 11,250.00 | 5,948.28 |
| Kern/Mariani | $15,000.00 | 3.8 | 62,510.00 | 9,500.00 | 5,023.00 |
| Krahel | $15,000.00 | 4.6 | 75,670.00 | 11,500.00 | 6,080.48 |
| Leemon | $15,000.00 | 3.8 | 62,510.00 | 9,500.00 | 5,023.00 |
| Lippard | $15,000.00 | 3.9 | 64,155.00 | 9,750.00 | 5,155.19 |
| Mayer | $15,000.00 | 5.2 | 85,540.00 | 13,000.00 | 6,873.58 |

APPENDIX "A"

C30652

E X H I B I T "A"
SETTLEMENT CONSIDERATION
ON A PER HOME BASIS

| Individual Homes | Allocation For Emotional Distress | Percent (%) of Allocation Per Home | Settlement Amount Less Emotional Distress | Allocation for Investiga- tional Costs | Allocation for Litigation Costs |
|---|---|---|---|---|---|
| Ochs | $15,000.00 | 4.5 | 74,025.00 | 11,250.00 | 5,948.28 |
| Ostergaard | $15,000.00 | 3.5 | 57,575.00 | 8,750.00 | 4,626.45 |
| Ownby | $15,000.00 | 4.0 | 65,800.00 | 10,000.00 | 5,287.36 |
| Prudham/ Repansky | $15,000.00 | 3.9 | 64,155.00 | 9,750.00 | 5,155.19 |
| Quinlan | $15,000.00 | 4.3 | 70,735.00 | 10,750.00 | 5,683.92 |
| Schayer | $15,000.00 | 3.3 | 54,285.00 | 8,250.00 | 4,362.08 |
| Tun | $15,000.00 | 3.8 | 62,510.00 | 9,500.00 | 5,023.00 |
| TOTAL | $360,000.00 | 100% | $1,645,000.00 | 250,000.00 | $ 132,184.26 |

TOTAL RECAP

Finkelstein vs. Leisure
Project Recap
Preliminary

| | | |
|---|---|---:|
| 2.0 | Roofs | 180,819.00 |
| 3.0 | Chimneys | 33,048.00 |
| 4.0 | Attics | 2,930.00 |
| 5.0 | Stucco | 210,046.00 |
| 6.0 | Doors | 13,859.00 |
| 7.0 | Ceramic Tile | 135,268.00 |
| 8.0 | Fireplace Boxes | 6,790.00 |
| 9.0 | Wood Floors | 44,079.00 |
| 10.0 | Misc. (Int. Dryw. Rep. & Paint) | 126,427.00 |
| 11.0 | Structural | 18,617.00 |
| 12.0 | Pot Shelves | 11,382.00 |
| 13.0 | Windows | 84,946.00 |
| 14.0 | Mechanical | 116,805.00 |
| | SUBTOTAL: | 985,016.00 |
| 10% Contingency | | 98,502.00 |
| | | 1,083,518.00 |
| 6% General Conditions | | 86,682.00 |
| | | 1,170,200.00 |
| 20% Profit & Overhead | | 234,041.00 |
| | TOTAL BURDENED COSTS: | 1,404,241.00 |

NON-CONTRACTORS ITEMS:

| | | | |
|---|---|---:|---:|
| Arch. Eng. Plans & Permits 10% | | 140,424.00 | |
| Bonding & Insurance | 3% | 42,128.00 | |
| Soils Eng. & Inspections | | | |
| During Construction | | 13,200.00 | |
| Move Out & Move Back | | 61,200.00 | |
| Additional Living Expenses | | 72,000.00 | |
| | | 328,952.00 | 328,952.00 |

TOTAL ARCHITECTURAL: 1,733,193.00

| | | |
|---|---|---:|
| 15.0 | Walls at Tops of Slopes | 89,900.00 |
| 16.0 | Retaining Walls | 90,458.00 |
| 17.0 | Deepened French Drains | 69,126.00 |
| 18.0 | Pool Repair & Edge Beams | 67,185.00 |
| 19.0 | Deepened Footing & Drain | 833,678.00 |

TOTAL DRAINAGE: 1,149,347.00

APPENDIX "B"

TOTAL RECAP Page 27

 Finkelstein vs. Leisure
 Project Recap
 Preliminary

ALTERNATE #1: Total Architectural: 1,733,193.00
 Total Drainage: 1,149,347.00
 Regrades Lots, R/R
 Flatwork (3 Ft. Cap): 4,537,431.00

 ESTIMATE TOTAL: 7,419,971.00

ALTERNATE #1A: Total Architectural: 1,733,193.00
 Total Drainage: 1,149,347.00
 Regrade Lots, R/R
 Flatwork (1 Ft. Cap): 2,728,141.00

 ESTIMATE TOTAL: 5,610,971.00

ALTERNATE #2: 1. Total Architectural &
 Post-Tension Slabs: 6,520,405.00
 2. Walls at Tops of Slopes: 89,900.00
 3. Deepened French Drains: 68,126.00
 4. Pool Repair & Edge Beams: 67,185.00
 5. Regrade Lots, R/R
 Flatwork (3 Ft. Cap): 4,537,630.00

 ESTIMATE TOTAL: 11,283,246.00

ALTERNATE #2A: 1. Total Architectural &
 Post-Tension Slabs: 6,520,405.00
 2. Walls at Tops of Slopes: 89,900.00
 3. Deepened French Drains: 68,126.00
 4. Pool Repair & Edge Beams: 67,185.00
 5. Regrade Lots, R/R
 Flatwork (1 Ft. Cap): 2,727,948.00

 ESTIMATE TOTAL: 8,679,794.00

## APPENDIX C

Akin Residence
4912 Alameda Drive
Oceanside, CA Lot #102

Page 3

Plan Type 3A-2652 Sq.Ft.

Finkelstein vs. Leisure
Estimate Recap Per House
Preliminary

| | | |
|---|---|---:|
| 2.0 | Roofs | 8,314.00 |
| 3.0 | Chimneys | 651.00 |
| 4.0 | Attics | 75.00 |
| 5.0 | Stucco | 9,092.00 |
| 6.0 | Doors | 358.00 |
| 7.0 | Ceramic Tile | 3,980.00 |
| 8.0 | Fireplace Boxes | 0.00 |
| 9.0 | Wood Floors | 5,243.00 |
| 10.0 | Miscellaneous (Int. Dryw. Rep. & Paint) | 4,623.00 |
| 11.0 | Structural | 620.00 |
| 12.0 | Pot Shelves | 312.00 |
| 13.0 | Windows | 2,903.00 |
| 14.0 | Mechanical | 5,147.00 |
| | SUBTOTAL: | 41,318.00 |
| 10% Contingency | | 4,132.00 |
| | | 45,450.00 |
| 8% General Conditions | | 3,636.00 |
| | | 49,086.00 |
| 20% Profit & Overhead | | 9,817.00 |
| | TOTAL BURDENED COSTS: | 58,903.00 |

NON-CONTRACTORS ITEMS:

| | | | |
|---|---|---:|---:|
| Arch. Eng. Plans & Permits | 10% | 5,890.00 | |
| Bonding & Insurance | 3% | 1,767.00 | |
| Soils Eng. & Inspections During Construction | | 550.00 | |
| Move Out & Move Back | | 2,550.00 | |
| Additional Living Expenses | | 3,000.00 | |
| | | 13,757.00 | 13,757.00 |

| | | |
|---|---|---:|
| | TOTAL ARCHITECTURAL: | 72,660.00 |
| 15.0 | Walls at Tops of Slopes | 12,845.00 |
| 16.0 | Retaining Walls | 0.00 |
| 17.0 | Deepened French Drains | 0.00 |
| 18.0 | Pool Repair & Edge Beams | 0.00 |
| 19.0 | Deepened Footing & Drain | 33,382.00 |
| | TOTAL DRAINAGE: | 46,227.00 |

APPENDIX "C"

Akin Residence
4912 Alameda Drive
Oceanside, CA Lot #102

Page 3-A

Plan Type 3A-2652 Sq.Ft.

| ALTERNATE #1: | Total Architectural: | 72,660.00 |
| | Total Drainage: | 46,227.00 |
| | Regrades Lots, R/R | |
| | Flatwork (3 Ft. Cap): | 201,727.00 |
| | ESTIMATE TOTAL: | 320,614.00 |

| ALTERNATE #1A: | Total Architectural: | 72,660.00 |
| | Total Drainage: | 46,227.00 |
| | Regrade Lots, R/R | |
| | Flatwork (1 Ft. Cap): | 114,351.00 |
| | ESTIMATE TOTAL: | 233,238.00 |

ALTERNATE #2:
1. Total Architectural &
 Post-Tension Slabs: 268,842.00
2. Walls at Tops of Slopes: 12,845.00
3. Deepened French Drains: 0.00
4. Pool Repair & Edge Beams: 0.00
5. Regrade Lots, R/R
 Flatwork (3 Ft. Cap): 201,727.00

 ESTIMATE TOTAL: 483,414.00

ALTERNATE #2A:
1. Total Architectural &
 Post-Tension Slabs: 268,842.00
2. Walls at Tops of Slopes: 12,845.00
3. Deepened French Drains: 0.00
4. Pool Repair & Edge Beams: 0.00
5. Regrade Lots, R/R
 Flatwork (1 Ft. Cap): 114,351.00

 ESTIMATE TOTAL: 396,038.00