75 Cal.Rptr.2d 207 (1998)
64 Cal.App.4th 264
DILLINGHAM CONSTRUCTION N.A., INC., Cross-complainant and Respondent,
v.
NADEL PARTNERSHIP, INC., Cross-defendant and Appellant.
No. B111638.
Court of Appeal, Second District, Division Four.
May 27, 1998.
*208 Breidenbach, Buckley, Huchting, Halm & Hamblet, Gary A. Hamblet and Kendall Caudry, Los Angeles, for Cross-defendant and Appellant.
Marrone, Robinson, Frederick & Foster, Phillip R. Marrone, Jay Robinson and Robert O. Boon, Burbank, for Cross-complainant and Respondent.
BARON, Associate Justice.
Appellant The Nadel Partnership, Inc. ("Nadel"), an architecture firm, was found by a jury to be 10 percent liable for a discrete set of defects in a construction project which would cost $3,437,494 to repair. The cost of overall repairs to the project was estimated at up to $51 million by the plaintiff, who settled for a total of approximately $15 million paid by other defendants. On a cross-claim for indemnity brought by one of the settling defendants, the trial court allowed the jury to decide how much of the unallocated lump sum settlement should be attributed to the defects for which Nadel was ultimately found responsible. The jury concluded that $4,658,677 of the $15 million settlement was reasonably paid toward those claims. Based on the jury's findings, the court ordered Nadel to pay cross-claimant $1,633,971 as its percentage share of the settlement entered into by the plaintiff and the settling defendants.[1]
The trial court's ruling meant that the cross-claimant was permitted to recover from nonsettling codefendant Nadel an amount in indemnity greatly in excess of that which the plaintiff could have recovered in actual damages from Nadel, based on the findings of the jury. Moreover, it was allowed to do so based on a finding that, despite having obtained a deep discount from plaintiffs reported damages in the overall settlement, the settling defendants settled the one aspect for which Nadel was potentially responsible for in excess of $1 million more than it was worth. The evidence in support of the finding was the testimony of the attorney for cross-claimant, who was permitted to explain to the jury his understanding of how the settlement proceeds should be allocated.
Without deciding whether a good faith settlement in excess of actual damages can ever be determinative of a nonsettling defendant's duty to indemnify, we conclude that, on the evidence before us, the cross-claimant cannot base its claim against Nadel on having paid more in settlement than plaintiff suffered in actual damages because: (1) the settling parties did not allocate settlement proceeds between those claims for which Nadel was potentially liable and those for which it was not; and, as a consequence, (2) the allocation was not subjected to a proper good faith determination under Code of Civil Procedure section 877.6. As a result, we further conclude that Nadel's liability on the indemnity cross-claim is limited to 10 percent of $3,437,494, the amount found by the jury to represent its actual culpability.

FACTUAL AND PROCEDURAL BACKGROUND
This case arises from the construction of a 416 unit luxury condominium project undertaken by developer Century Hill North Company ("CHN"). Respondent Dillingham Construction, N.A., Inc. ("Dillingham") was the general contractor for phase I, consisting of buildings one, two, and three, and the Ray Wilson Company was the general contractor for phase II, consisting of buildings four, five, and six. The Century Park Place Condominium Association ("the Association"), representing the owners of the condominiums, brought suit against CHN, Dillingham, the Ray Wilson Company and others contending that there were defects in the design and *209 construction of the condominiums. CHN and Dillingham cross-claimed against a number of parties, including the large group of subcontractors involved in one or the other or both phases of the project, and appellant Nadel, which, along with Abraham Shapiro, was the architect for phase I.[2]

1. The Settlement
After several years of litigation, most of the defendants and cross-defendants entered into a global settlement with the Association. Under the settlement agreement the Association settled with the "Developers/General Contractors" (identified as CHN, Watt Consolidated Partnership, Ocean Industries, Inc., Shapell Industries, Inc., Luxury Developers, Inc., Neu Properties, Inc., Dillingham, and the Ray Wilson Company) and a second group identified as "the Subcontractors."[3]
The total settlement amount was $15,220,659.07. CHN paid $3,000,000 of this amount (or 19.71 percent) and Dillingham paid $4,165,000 (27.36 percent). The subcontractors group paid $4,908,009.07 (32.24 percent), and the $3,147,650 remainder (roughly 20 percent) was paid by the Ray Wilson Company. Under the terms of the settlement, the Association agreed to dismiss its entire complaint with prejudice, thereby freeing all potential defendants, settling and nonsettling, from further action by the plaintiff. CHN, Dillingham, and the Ray Wilson Company also agreed to mutually release each other and the settling subcontractors.
Dillingham took assignment of CHN's cross-claim for indemnity and pursued that and its own claim for indemnity against nonsettling parties Nadel and Abraham Shapiro.

2. The Good Faith Determination
The settling parties moved for a good faith determination on the total amount of the settlement. In their moving papers, the parties revealed that the Association had prepared a repair estimate which showed a total cost to repair all defects of $51,777,886, of which $19,506,822 was designated to the category of "Architectural repairs[.]" In their moving papers, the parties asked the court to allocate the settlement contributions of CHN to buildings one through six and their associated common areas and appurtenances, and the $4,165,000 from Dillingham to buildings one through three and their associated common areas and appurtenances. No other allocations were requested or discussed.
The trial court approved the good faith of the settlement, but stated in its minute order: "... No allocation is being made at this time. It is the intention of the Court to proceed to a jury trial in which such an allocation will be made and if it takes thirty to forty-five days to reach a jury verdict, that is what will be done."
Nonsettling subcontractor Lee Bolin petitioned for writ of mandate asking for an order from the trial court allocating the settlement proceeds between claims. The settling parties, including Dillingham, argued at that time that no allocation was necessary. The writ petition was summarily denied. (See Lee Bolin and Associates, Inc. v. Superior Court (Century Hill. North and Dillingham Construction Co.) (Aug. 9, 1996) B101898 [nonpub. opn.].)

3. The Evidence at Trial
The parties were in agreement that Nadel was only involved in phase I of the project, and that its culpability was limited to what are referred to as the "13 architectural defects" or "13 defects."
To support the amount of damages actually suffered as the result of the 13 defects, Dillingham offered the testimony of its construction expert, Robert James, an architect who coordinated the work of the numerous experts retained by Dillingham, and who evaluated the plaintiffs claims and the culpability of the various subcontractors. He recalled that there had been discussions between the experts for both plaintiff and defendants in which some consensus was *210 reached on the existence of certain problems, but not the cost of repair. James analyzed the Association's damage summaries anew for this trial. After reviewing the claims, he came to the conclusion that total damages reflective of the thirteen items for buildings one, two, and three of phase I should have been $5,939,601.
James broke down the plaintiffs "architectural costs" category into two subcategories: those for which he believed the architects shared responsibility, and those for which he believed the architects did not. The following represents his understanding and analysis of the 13 defects actually attributable to the architects:
(1) The Association contended there was a problem with leaking tub and shower enclosures due to failure to adequately waterproof. James concurred and concluded it would cost $1,207,210 to repair the enclosures. He attributed 50 percent ($603,605) to the architects for failing to show waterproof membranes on the plans.
(2) The Association sought $150,000 to cure uneven floors in numerous units. Because James thought the actual cost would be much higher than the figure which appeared on the plaintiffs claim summaries, he used plaintiffs figure. He believed the architects were 80 percent responsible for this problem, which in monetary figures totaled $179,644.
(3) There were many large, unsightly cracks in the concrete slabs in the underground garages. James estimated the cost of repairing the cracks in the concrete slabs at $306,397. He attributed 20 percent of the fault to the architectural plans or $61,279 in monetary terms.
(4) The Association complained of, and James observed, water seeping through the garage walls. He estimated $33,193 for repairing leaks in the garage walls, and attributed 10 percent ($3,319) to the architects.
(5) There were decorative planter boxes placed in common areas located too close to nearby walls to allow proper air circulation and which appeared to be causing water damage due to location and inadequate drainage. The cost of removing and relocating the planter boxes and repairing any damage to nearby walls and framing was estimated to be $504,630. James attributed 5 percent ($25,232) to the architects.
(6) A problem with flashing on all the balconies and patios caused water damage in those areas. James estimated it would cost $261,125 to repair this item. Twenty-five percent of the problem was attributed to the architects which equates to $65,281.
(7) He identified a problem with the decks, leading to water intrusion and cracks in the flooring, and estimated it would cost $254,845 to repair. He attributed 10 percent ($26,485) to the architects.
(8) He noted a problem with water pooling on the condominiums' decks due to improper sloping and estimated it would cost $232,777 to repair and attributed 20 percent ($46,555) to the architects.
(9) James estimated it would cost $109,134 to repair an improper opening in the fire walls between the units. He attributed 40 percent ($43,654) to the architects.
(10) A problem with incomplete fire walls in the attic of one of the buildings would cost $33,989 to repair, and 15 percent ($5,098) was attributed to the architects.
(11) A problem with support for prefabricated metal fireplace units would cost $72,149 to repair, and James attributed 25 percent ($18,037) to the architectural drawing.
(12) The Association complained of leaking around sliding doors and windows, which James believed had a repair cost of $48,685, and to which he attributed 10 percent ($4,869) to the architects.
(13) The final problem identified was aluminum window ledges that leaked, which James estimated would cost $101,804 to repair. He estimated that 30 percent of that amount ($30,541) was the responsibility of the architects.
According to James's calculations, the percentage liabilities he ascribed to the architects averaged out to 18.75 percent of the repair costs for all of phase I. Total money damages attributable to the architects were $1,113,600 plus 10 percent of the relocation costs for a grand total of $1,151,400. This represented 32.75 percent of the cost of repair *211 of the 13 defects which James believed would cost a total of $3,400,494 to repair.[4]
The remaining share of fault for the 13 defects James believed should be placed on the subcontractors and Dillingham with Dillingham liable for "perhaps" 15 percent of the subcontractors' share. James also expressed the opinion that Dillingham needed to share responsibility on some of the other problems which arose in phase I. Based on his figure of approximately $6 million for correction of the problems in phase I, he believed Dillingham bore 15 percent of the responsibility for those defects which he estimated would cost a total of $2,480,170 to repair or $372,170 in monetary terms.
James did not believe that CHN should share any liability for the 13 defects. He ascribed liability to CHN on other parts of the project, but believed it was less than 1 percent at fault for defects in the project as a whole.
Bruce Mayfield, an attorney for the Association, was called to the stand.[5] Mayfield testified that he and his firm had retained a number of experts on behalf of plaintiff Association and these experts prepared a preliminary cost of repair estimate of $43 million, including over $3.8 million for the cost of relocating residents during the work. The figure for repairs alone on the initial estimate was approximately $39 million. Later, a second estimate was prepared (the one used in conjunction with the settlement negotiations) showing damages of $51 million, including approximately $47 million in repairs, and the rest in relocation costs. The main reason for the difference between the two estimates was the cost of adding soundproofing not included in the first estimate. Mayfield testified that the matter was ultimately settled pursuant to the agreement discussed above, that the Association received all monies to which it was entitled under the settlement agreement, and no apportionment was made by the Association for the various categories of damages. He acknowledged that although a certain amount of damages were placed into a category called "architectural" in the plaintiffs damage summaries, that category did not precisely match up with the damages plaintiff believed were attributable to the fault of the architects.
Bart Beddoe, an attorney who represented CHN during the lawsuit and the settlement, was also called. He testified CHN had retained a number of experts in the architectural and engineering fields, and that the parties deferred to Dillingham's architectural expert. He recalled that during settlement negotiations, there were areas of agreement between the experts on all sides as to the scope of certain problems. By the end of the settlement process, the Association had reduced its damage request to between $18 and $20 million.
Beddoe was asked what portion of the $51 million in the Association's damage summary related to phase I and which portion related to phase II. Beddoe testified that he believed it was about equal, but admitted on cross-examination that nothing in the settlement agreement purported to allocate any part of *212 the settlement proceeds to any particular phase or problems.
Finally, Robert Boon, an attorney for Dillingham, was sworn. He testified that of the $3 million paid by CHN, he understood $1.5 million was assigned to Dillingham. Boon testified that it was his further understanding that the settling defendants as a whole contributed a total of $8,631,300 of the settlement to compensate for phase I defects. He recalled that counsel for plaintiff advised him that the cost of repair of both phases was roughly the same. He also recalled that plaintiffs figure for damages for phase I was higher than Dillingham's, which, as James had testified, had been estimated to be approximately $6 million.
The witness testified that he attributed $2,966,300 of the subcontractors' total settlement to phase I (essentially by dividing each subcontractor's settlement payment in half if the subcontractor worked on both phases of the project or attributing it all to the phase or building on which the subcontractor worked for those who worked on only one phase or one building).[6] Boon was permitted to testify, over objection, that in his opinion phase I could not have been settled for less than the $8,631,330 paid. He reported that Dillingham paid $2,065,000 to settle phase I (Dillingham's total settlement payment of $4,165,000 less the $2.1 million obtained from Lee Bolin).
Boon expressed the belief that the relation between $5.9 million (James's calculation for damages for all of phase I) and $8,631,330 (the amount of the settlement Dillingham wanted to see attributed to all of phase I) of 137 percent should be used to get the "reasonable settlement figure" for the 13 architectural defects, which he believed was $4,658,677 (approximately $3,437,494 times 1.37). By using James's figures and his own calculations, Boon estimated that the subcontractors paid $1,860,037 toward the settlement of the 13 defects, meaning the $2,798,640 remainder must have been paid by CHN and Dillingham. Boon did not attempt to allocate between CHN and Dillingham.
On cross-examination, Boon admitted that the settling parties did not allocate the settlement in their agreement. He further admitted that attorneys for the subcontractors did not discuss allocation.
Dillingham argued in its closing that to get a figure for "reasonable settlement," the jury should take all of the $4,165,000 Dillingham paid (because Dillingham did not work on phase II), add one-half of the $3 million CHN paid in settlement or $1.5 million, and add $2,966,300 for the contribution of the subcontractors which was calculated by allocating the amount each subcontractor paid in settlement between the phases or buildings on which each subcontractor worked. This resulted in a total of $8,631,300. The jury was then asked to compare $5.9 million (James's estimate of the cost of repairs for phase I) with $3.4 million (the actual cost of repairing the 13 architectural defects, also derived from James's testimony). Since $3.4 million is roughly 54 percent of $5.9 million, to get a reasonable figure for settlement purposes, the jury was asked to multiply $8,631,300 (total reasonable settlement amount to be allocated to phase I according to Boon) by .54 to reach a reasonable settlement figure for the 13 defects: $4,658,677.

4. The Verdict and Judgment
Looking at the figures on the special verdict, we can see that the jury followed Dillingham's counsel's computations right down the line, although it disagreed with Dillingham when it came to ascribing proportionate fault. After hearing all of the evidence, the jury found by special verdict that the total amount of damages caused by the 13 defects was $3,437,494 and that the total sum paid by Dillingham, CHN, and Dillingham's subcontractors to plaintiff in settlement of its damage *213 claims relating to the 13 defects asserted against the architects in this litigation was $4,658,677, of which $2,798,640 was paid by Dillingham and CHN and the remaining $1,860,037 was paid by Dillingham's subcontractors. The jury also allocated fault for the 13 defects as follows: Dillingham25 percent; Nadel10 percent; CHN0 percent; Shapiro0 percent; and "all other persons or entities"65 percent.[7] In a separate part of the verdict, the jury found that CHN was negligent in other respects or as to other aspects of the project, but was not asked to and did not ascribe any percentage to CHN's fault.
The trial court incorporated the jury's findings into its final judgment, and was left with the task of determining how much Nadel was obligated to pay Dillingham for the two indemnity claims. The court took the total $4,658,677 found by the jury to have been paid by Dillingham and CHN for the 13 defects, multiplied that by Dillingham's fault of 25 percent to arrive at a figure of $1,164,669. It subtracted that figure from the $2,798,640 found by the jury to have been paid by Dillingham and CHN and awarded Dillingham the result, $1,633,971, plus costs of $26,594.58.
Nadel appeals contending that the indemnification figure was wrongly calculated resulting in a disproportionate burden being placed on it,[8] and that substantial evidence does not support any indemnification amount other than 10 percent of $3,437,494, the amount the jury ascribed to the 13 architectural defects.

DISCUSSION
The calculation that Dillingham, as CHN's assignee, is entitled to recover $1,633,971 from Nadel depends on $4,658,677 of the $15 million settlement being allocated to the 13 architectural defects, and a further allocation of that $4,658,677 into three smaller sums representing settlement payments of the subcontractors, Dillingham and CHN. Dillingham contends, and the trial court agreed, that the important issue for the jury to decide was not the amount of actual damages suffered by the Association and its members as a result of the 13 architectural defects, but the amounts paid by Dillingham and CHN to settle those claims and whether the amounts paid represented reasonable settlement numbers.
There is authority for the proposition that the amount paid in settlement of a claim as set forth in the settlement agreement is presumptively correct and may be introduced as evidence of an indemnitor's liability subject to the indemnitor's ability to establish that the amount paid was not reasonable under the circumstances. (See, e.g., Gouvis Engineering v: Superior Court (1995) 37 Cal. App.4th 642, 650, 43 Cal.Rptr.2d 785; Peter Culley & Associates v. Superior Court (1992) 10 Cal.App.4th 1484, 1498, 13 Cal.Rptr.2d 624.) However, the settlement here was a lump sum with no allocation made between claims. As a result, before reaching the issue of whether the amounts paid by Dillingham and CHN to settle the architectural defect claims were "reasonable," the jury had to first decide what had been paid by those parties toward that claim. This was no easy matter. Due to the complexities of the litigation, there was no immediately apparent way of knowing whether any particular party paid anything toward a particular item of damage, such as the 13 architectural defects, let alone how much. There were multiple defendants and multiple claims of injury, virtually none of which were joint and several as to all defendants. Every defendant could point to items on plaintiffs defect list for which it shared no possible responsibility. As to those discrete portions of the project on which a particular defendant worked, it could have been from 0 to 100 percent at fault for defects which arose. The defects *214 themselves could have been relatively minor or cost millions to repair. The settlement agreement reflects these variations; contributions from as low as $2,000 to as high as Dillingham's $4,165 million were accepted by plaintiff in complete settlement of all its member's claims.
Dillingham takes the position that the testimony of Boon, as a percipient witness to the settlement negotiations, or, alternatively, as an expert on construction litigation, could support the jury's finding that $4,658,677 was in fact allocated to the 13 architectural defects and that the subcontractors, Dillingham, and CHN contributed $1,860,037, $1,621,092, and $1,177,548 of this amount respectively. Nadel contends that these numbers cannot constitute substantial evidence in support of the judgment because they sprang from the head of counsel for Dillingham and were not the subject of negotiation or allocation by the settling parties. Nor were the allocations the subject of the hearing undertaken to determine the good faith of the settlement, which resolved the issue of only whether the settlement as a whole was adequate. For the reasons hereafter discussed, we agree with Nadel.

A
Our analysis starts with the Supreme Court's seminal decision in Li v. Yellow Cab Co. (1975) 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226, which set out the framework for our system of comparative liability and assessment of proportionate fault between joint tortfeasors. The court recognized in Li that its decision raised issues concerning "administration of a rule of comparative negligence in cases involving multiple parties," and that "[p]roblems of contribution and indemnity among joint tortfeasors lurk in the background. [Citations.]" (13 Cal.3d at p. 823, 119 Cal.Rptr. 858, 532 P.2d 1226.)
The court addressed one such problem in American Motorcycle Assn. v. Superior Court (1978) 20 Cal.3d 578, 146 Cal.Rptr. 182, 578 P.2d 899, where it concluded that "adoption of comparative negligence" did not "warrant the abolition or contraction of the established `joint and several liability' doctrine [under which] each tortfeasor whose negligence is a proximate cause of an indivisible injury remains individually liable for all compensable damages attributable to that injury." (Id. at p. 582, 146 Cal.Rptr. 182, 578 P.2d 899.) In American Motorcycle, the court decided that we would not follow those jurisdictions in which settlement with one defendant reduces every other defendant's liability by an amount "measured by the settling tortfeasor's proportionate responsibility for the injury. [Citation.]" (Id. at p. 604, 146 Cal.Rptr. 182, 578 P.2d 899.) Instead, "a plaintiffs recovery from nonsettling tortfeasors should be diminished only by the amount that the plaintiff has actually recovered in a good faith settlement...." (Ibid.; accord, Knox v. County of Los Angeles (1980) 109 Cal.App.3d 825, 833, 167 Cal. Rptr. 463 ["`[A] plaintiffs recovery from nonsettling tortfeasors should be diminished only by the amount that the plaintiff has actually recovered in a good faith settlement, rather than by an amount measured by the settling tortfeasor's proportionate responsibility for the injury. [Citation.]'"].)
Code of Civil Procedure section 877.6 provides the framework under which a settlement in a multi-party litigation can be determined to be in good faith and the amount by which plaintiffs claim has been diminished can be precisely calculated. Under its provisions, "Any party to an action in which it is alleged that two or more parties are joint tortfeasors or co-obligors on a contract debt shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors or co-obligors...." (Code Civ. Proc., § 877.6, subd. (a)(1).)
"Any party" may seek a good faith determination, but if, as is usually the case, a settling party seeks the determination, it must "give notice of settlement to all parties and to the court, together with an application for determination of good faith settlement and a proposed order. The application shall indicate the settling parties, and the basis, terms, and amount of the settlement." (Code Civ. Proc., § 877.6, subd. (a)(2).) Once that has been done, "[t]he party asserting the lack of good faith shall have the burden of proof on that issue." (Id., subd. (d).)
*215 A good faith settlement has two important consequences. First, "it shall reduce the claims against the others [i.e., the nonsettling defendants] in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater." (Code Civ. Proc., § 877, subd. (a).) This is known as the offset or setoff, and comes into play when the plaintiff settles for a figure which he or she believes represents partial damages, and then goes against the remaining defendant or defendants for the remainder. If, for example, the plaintiff proves at trial that he or she suffered $100,000 in damages, but has already received $40,000 from settling defendants, the most he or she can recover from nonsettling defendants is $60,000. The $40,000 represents the offset to which nonsettling defendants are entitled.
Second, "[a] determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor or co-obligor from any further claims against the settling tortfeasor or co-obligor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault." (Code Civ. Proc., § 877.6, subd. (c); see also Code Civ. Proc., § 877, subd. (b) ["Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect: [¶] ... [¶] (b) It shall discharge the party to whom it is given from all liability for any contribution to any other parties."].) This means that defendants who have settled for less than their proportionate share of damages cannot be required to pay any more, and the nonsettling defendants can be forced to make up the shortfall. (See, e.g., Lyly & Sons Trucking Co. v. State of California (1983) 147 Cal.App.3d 353, 195 Cal.Rptr. 116.)
Problems in calculating the offset arise in multiparty cases where not all defendants are jointly and severally liable for all claims, such as the typical construction litigation. The court in Alcal Roofing & Insulation v. Superior Court (1992) 8 Cal.App.4th 1121, 10 Cal.Rptr.2d 844, addressed some of these problems. There, the developer settled with the plaintiff homeowners' association for $4.4 million, then sought, and obtained, approval from the trial court for the settlement agreement's allocation of only $100,000 to roofing issues. The roofer, the sole remaining nonsettling defendant, petitioned for writ of mandate to overturn the trial court's approval of the settlement.[9] The court noted that this was not a typical one-plaintiff, one-injury action where the amount of the offset is equal to the total amount of the settlement no matter how many defendants are before the court. In the case before it "the amount of the offset is clouded ... by settling claims for separate injuries not all of which would be attributable to conduct of the remaining defendants." (Id. at p. 1124, 10 Cal.Rptr.2d 844.) Therefore, "the cash amount of the settlement does not dictate the amount of the offset," and "the settling parties must include an allocation or a valuation in their agreement." (Id. at pp. 1124-1125, 10 Cal.Rptr.2d 844, emphasis added.)
The court explained the importance of having this allocation worked out between the plaintiff and settling defendant themselves prior to coming to court for a good faith hearing. "... A natural tension will exist between plaintiff, who benefits by undervaluing the settlement in order to permit greater recovery against the remaining defendants, and the settling defendant, who would want the settlement value high enough to be approved in order to relieve settling defendant from liability for comparative indemnity or contribution." (Alcal Roofing & Insulation v. Superior Court, supra, 8 Cal.App.4th at p. 1125, 10 Cal.Rptr.2d 844.) In the case before it, the court noted that the only evidence of any allocation was in the settlement agreement between the developer and the homeowners' association. As to any other *216 settling defendants, "[i]f any of them did not allocate part of its settlement to nonroofing issues, roofer may obtain an offset for the entire amount of that defendant's settlement." (Id. at p. 1127, 10 Cal.Rptr.2d 844, emphasis added.)
The holding in Alcal was the foundation for two comprehensive appellate court opinions which outlined in detail how the settling parties and the trial court must proceed in order to arrive at a determination that both the settlement and the allocation of proceeds in multi-party, multi-claim construction litigation meet the requirement of good faith: Erreca's v. Superior Court (1993) 19 Cal. App.4th 1475, 24 Cal.Rptr.2d 156 and Regan Roofing Co. v. Superior Court (1994) 21 Cal. App.4th 1685, 27 Cal.Rptr.2d 62.
In Erreca's, certain defendants settled with the plaintiff for nearly $6.5 million and allocated $1.5 million to soils claims. All other proceeds were allocated to nonsoils claims. The nonsettling defendants' potential liability lay primarily in the area of soils claims. After a hearing and determination of good faith, the nonsettling defendants sought writ review. The appellate court agreed with Alcal that before the trial court could make a good faith determination, "a party seeking confirmation of a settlement must explain to the court and to all other parties not only who has settled with whom and for what dollar amount, but whether any settlement is allocated and how between issues and/or parties, as well as describing and valuing any nonmonetary consideration included. [Citation.]" (Erreca's, supra, 19 Cal.App.4th at p. 1495, 24 Cal.Rptr.2d 156.) "To the rules set forth in Alcal," the court in Erreca's added the following principles: "A party seeking confirmation of a settlement must explain to the court and to all other parties, by declaration or other written form, the evidentiary basis for any allocations and valuations made, and must demonstrate that the allocation was reached in a sufficiently adversarial manner to justify the presumption that a reasonable valuation was reached. [Citation.]" (Erreca's, supra, 19 Cal.App.4th at pp. 1495-1496, 24 Cal.Rptr.2d 156, emphasis added.)
Nonsettling defendants raised an issue of whether the good faith determination violated their due process rights because, among other things, they were excluded from the settlement negotiations where the initial allocation was madean allocation which is presumptively in good faith under Code of Civil Procedure section 877.6, subdivision (c).[10] The court concluded that "twin safeguards" protect nonsettling defendants against unfair results or violation of their due process rights: "[1] the adverse nature of the settlement negotiations and [2] the requirement of court approval of the settlement elements before they may be given full effect." (Erreca's, supra, 19 Cal.App.4th at pp. 1492-1493, 24 Cal.Rptr.2d 156.) Concerning the first safeguard, the court cited with approval Peter Culley, supra, 10 Cal. App.4th 1484, 13 Cal.Rptr.2d 624, where "the court observed that there would be no justification for giving presumptive effect to an allocation which is not the product of adverse negotiation. Even though one may presume that the parties have reasonably allocated settlement proceeds between issues in the action, such a presumption `should be reserved for a settlement by parties with truly adverse interests in the allocation. [Citation.]' [Citations.]" (Erreca's, supra, 19 Cal. App.4th at p. 1493, 24 Cal.Rptr.2d 156, quoting Peter Culley, supra, 10 Cal.App.4th at p. 1498, 13 Cal.Rptr.2d 624.)
In Regan Roofing, where the court was similarly faced with a writ petition brought by nonsettling tortfeasors challenging a finding that a settlement of a construction dispute and allocation of settlement proceeds between claims was made in good faith, the court likewise held: "Since the settling parties have the most knowledge of the value of the various claims they are attempting to settle, they are required to make an allocation of settlement proceeds among those various claims, subject to court approval of the showing made.... Moreover, where an allocation is made of settlement proceeds which *217 will affect the ultimate setoff or credit that a nonsettling defendant will receive against any future judgment, the allocation may not be given presumptive effect unless it was the product of adverse negotiation. [Citation.]" (Regan Roofing Co. v. Superior Court, supra, 21 Cal.App.4th at pp. 1702-1703, 27 Cal.Rptr.2d 62, emphasis added.)
The court went on to say that when seeking a ruling from the trial court that an allocation of settlement proceeds was made in good faith, "what should be required of the settling parties is that they furnish to the court and to all parties an evidentiary showing of a rational basis for the allocations made and the credits proposed. They must also show that they reached these allocations and credit proposals in an atmosphere of appropriate adverseness so that the presumption may be applied that a reasonable valuation was reached. [Citation.]" (Regan Roofing Co. v. Superior Court, supra, 21 Cal.App.4th at p. 1704, 27 Cal.Rptr.2d 62.)

B
Alcal, Erreca's and Regan Roofing all agree that the settling parties must include an allocation or a valuation of the various claims in their settlement agreement in order to obtain a finding of good faith. But all were decided in the context of partial settlements where the plaintiffs intended to go forward with their claims against nonsettling defendants. In that situation, the failure to allocate between claims would result in an inability to determine the offset to which nonsettling defendants are entitled under Code of Civil Procedure section 877, subdivision (a). In this case, there was a complete settlement of all of plaintiffs claims, and only the settling parties intended to obtain recovery from nonsettling defendants. Offset is not an issue. Is a different result warranted?
One case which so held is Gouvis Engineering v. Superior Court (1995) 37 Cal. App.4th 642, 43 Cal.Rptr.2d 785. In Gouvis, a nonsettling defendant was dismayed because he believed a $6.5 settlement agreement between plaintiff and other defendants represented an overly generous estimation of plaintiffs damages, and "[w]hile no specific ruling has been made on the breakdown of this total amount to whatever categories of damage may be the responsibility of Gouvis, it may be presumed that if the total is exaggerated the subparts also will be exaggerated." (37 Cal.App.4th at p. 648, 43 Cal. Rptr.2d 785.) Gouvis had not been sued by plaintiff, and his concern was that these figures could somehow be used against him in the settling defendants' cross-claims for indemnity.
In attempting to determine "[j]ust exactly how Gouvis has been prejudiced by the ruling," (Gouvis, supra, 37 Cal.App.4th at p. 647, 43 Cal.Rptr.2d 785), the court reviewed the holdings in Alcal, Erreca's, and Regan Roofing. Those holdings, the court concluded, all required "settling parties to allocate the settlement to various claims ... for the specific purpose of arriving at the proper offset" where plaintiff enters into a partial settlement with one defendant, and then pursues the litigation to recover the remainder of his damages from nonsettling defendants. (Gouvis, supra, at p. 648, 43 Cal.Rptr.2d 785.) As between defendants, the court believed, the concept of offset has no relevance and so it is not necessary to determine its amount: "... As we stated [in Regan Roofing], `... a proper valuation of the indemnity rights is necessary to accord appropriate credit to the nonsettling defendants against any eventual plaintiffs' judgment that they may suffer....' ([Regan Roofing Co. v. Superior Court, supra, 21 Cal.App.4th] at p. 1715 [27 Cal.Rptr.2d 62].) Where a settlement can have no effect as an offset against future claims, what practical effect can it have as to nonsettling parties? [¶] A contractual settlement of a disputed claim is an agreement the interpretation and effect of which are governed by ordinary principles of contract law. [Citation.] Gouvis, not being a party to the settlement agreement between Developers and Association, cannot, absent some unusual exception to ordinary principles of contract law, be bound or affected by any of its terms. The, peculiar twist of law intruding upon this otherwise simple scenario is the applicability of sections 877 and 877.6 [of the Code of Civil Procedure]. As noted above, section 877 specifically provides that *218 the settlement and release of one joint tortfeasor or co-obligor does not effect a release of the nonsettling tortfeasor. Since the reciprocating provision is that the nonsettling tortfeasor obtains a credit against his remaining liability equal to the settlement, it is necessary that a means be found for determining the amount of the offset." (Gouvis, supra, 37 Cal.App.4th at pp. 648-649, 43 Cal.Rptr.2d 785, original emphasis, fn. omitted.) Because the court believed that allocation was necessary only to establish the amount of the offset, the court held that a nonsettling defendant has no standing to complain about the valuation of the settlement "and whatever underlying allocations may be deemed to have been approved" where offset was not an issue because the nonsettling defendant has not been sued by the plaintiff. (Id. at p. 651, 43 Cal.Rptr.2d 785.)
In reaching this conclusion, the Gouvis court considered whether there might be some impact from the good faith determination on the indemnification action between the settling defendant and Gouvis because of the holding in Peter Culley, supra, where "the court addressed the effect of an allocation of settlement to specific potential subcontractor damage, and distinguished between the proof required at a section 877.6 good faith hearing and that necessary to establish a claim of indemnification," and "concluded that the allocation made at the section 877.6 hearing is not conclusive in the indemnity action, but is only `presumptive evidence of liability and the amount thereof.' [Citation.]" (Gouvis, supra, 37 Cal.App.4th at p. 650, 43 Cal.Rptr.2d 785, quoting Peter Culley, supra, 10 Cal.App.4th at p. 1498, 13 Cal.Rptr.2d 624.) Based on its interpretation of the holding in Peter Culley, the court stated that, "[i]n Developers' action against Gouvis for indemnity the terms of settlement approved at the good faith hearing are no doubt admissible in evidence" because "[a] key element of any action for indemnification is a showing of damage incurred by the indemnitee. [Citation.]" (Gouvis, supra, at p. 650, 43 Cal.Rptr.2d 785.) Nevertheless, Gouvis was "not legally prejudiced by the good faith order" because "the allocation and indeed the valuation put on the settlement by the settling parties and approved by the trial judge as `good faith' have no binding or res judicata effect as to Gouvis in terms of the subsequent indemnity action," and "[a]t the trial of Developers' indemnity action against Gouvis the burden of proof will be upon Developers to prove the amount that has been paid by virtue of injury caused by Gouvis's fault. [Citation.]" (Id. at pp. 650-651, 43 Cal.Rptr.2d 785.)
Dillingham relies on this language in Gouvis to justify its method of establishing Nadel's liability on the indemnity cross-claim. However, since no allocation was contained in the settlement agreement or presented to the trial court at the time of the good faith hearing, Dillingham was foreclosed from basing its indemnification claim against Nadel on the terms of the settlement. Where a settling defendant is entitled to only partial indemnity, failure to allocate between claims in the settlement agreement means that damages must be proven without the presumptive evidence of the nonsettling defendant's liability afforded by a settlement agreement in which proceeds have been allocated. In' that situation, the settlement amount works only to place an upper limit on the indemnity claim, and an undisclosed and possibly nonexistent allocation cannot be used to establish actual damages.
Our conclusion is supported by the decision in Peter Culley, supra, 10 Cal.App.4th 1484, 13 Cal.Rptr.2d 624, which involved a claim of indemnity between tortfeasors. A developer had sued an architect for designing inadequate foundational footings. The developer and architect settled for $225,000, agreeing that $200,000 was paid "`in recognition of the risks of liability associated with' [a nonparty structural engineer's] foundation design work...." (Id. at p. 1489, 13 Cal. Rptr.2d 624.) The architect assigned all of its rights under an express indemnity agreement with the structural engineer to the developer. Subsequently, the trial court found that the settlement, including the allocation of $200,000 to the foundation issue, "was in good faith and was conclusive against [the structural engineer]." (Ibid., emphasis added.)
*219 The appellate court initially determined that such an allocation could at most be presumptively correct, comparing the situation to that of an insurer and insured: "`[I]f an insurer wrongfully fails to provide coverage or a defense, and the insured then settles the claim, the insured is given the benefit of an evidentiary presumption. In a later action against the insurer for reimbursement based on a breach of its contractual duty to defend the action, a reasonable settlement made by the insured to terminate the underlying claim against him [her] may be used as presumptive evidence of the insured's liability on the underlying claim, and the amount of such liability. [Citation.]'" (Peter Culley, supra, 10 Cal.App.4th at pp. 1493-1494, 13 Cal.Rptr.2d 624, quoting Isaacson v. California Ins. Guarantee Assn. (1988) 44 Cal.3d 775, 791, 244 Cal.Rptr. 655, 750 P.2d 297.)
The court went on to hold that in the situation before it, the trial court would have erred had it given the allocation even a presumption of correctness because there is "no justification for giving presumptive effect to an allocation that is not the product of adverse negotiation." (Peter Culley, supra, 10 Cal.App.4th at p. 1498, 13 Cal.Rptr.2d 624.) "A presumption that the parties have reasonably allocated a settlement amount between issues in the action should be reserved for a settlement by parties with truly adverse interests in the allocation. [Citation.] Where the parties have purported to settle an imaginary dispute over allocation, that allocation should be given no special treatment in an indemnity action." (Ibid.)
As we see it, a reasonable settlement amount can be used to establish damages in equitable indemnity actions, where (1) the parties to the settlement agreement have entered into a negotiated agreement specifically allocating settlement proceeds between claims; and (2) in a proceeding in which the nonsettling parties are allowed to be heard, the trial court finds that the allocation was made in good faith. If no such pretrial allocation and determination has been made, there may be other methods to establish damages. However, an attorney for the party seeking indemnification cannot be permitted to testify, after the fact, as to how he believes settlement proceeds would have been allocated had the parties negotiated and resolved the issue.

C
Turning to the present case, Boon, attorney for Dillingham, testified to his "understanding" that $8,631,300 of the $15 million settlement was allocated to phase I. All of his other figures flowed from that number and from his calculation that $2,966,300 of the subcontractors' settlement contribution of $4,908,009 should be allocated to phase I by breaking the $4,908,009 down in accordance with which phase each subcontractor worked on or by dividing the contribution in half if the subcontractor worked on both phases.
Boon's testimony to his personal understanding is insufficient to establish that there was an agreement between adverse parties to allocate $8,631,300 to phase I. (See Merced County Sheriff's Employee's Assn. v. County of Merced (1987) 188 Cal.App.3d 662, 672, 233 Cal.Rptr. 519 ["[M]utual assent [to contract] is gathered from the reasonable meaning of words and the acts of the parties, not from their unexpressed intentions or understanding. [Citation.]"].) Moreover, the existence of any such agreement is directly contradicted by the settlement agreement, which contains no discussion of allocation, and contains an integration clause indicating that it expresses the entire understanding of the parties. It is farther contradicted by the testimony of the other parties' attorneys. Mayfield, attorney for plaintiff, testified that as far as plaintiff was concerned, no allocation had been made. Beddoe, attorney for CHN, testified that he recalled plaintiffs damages in phase I and phase II to be about equal, and confirmed that nothing in the settlement agreement allocated any part of the settlement.
The reason plaintiff did not agree to such an allocation is clear. There were 216 condominiums in phase I and 200 condominiums in phase II. If $8,631,300 had been allocated to phase I, this would have left only $6,589,359 for phase II homeowners. It is hard to see how plaintiffs counsel could have agreed to anything but an equal or near-equal allocation between phase I and phase II, rather *220 than the lopsided allocation Dillingham advanced.
It may be that it was settling defendants'
understanding that $8,631,300 should be allocated to phase I. If so, it was a collusive allocation. Collusion exists where only one of the parties cares how proceeds are allocated, which certainly is the case where, as here, all parties except one give up their rights against nonsettling defendants. In that situation, the remaining settling defendant has an incentive to allocate as large a percentage of proceeds as possible to aspects of the construction for which the nonsettling defendant is potentially liable in order to maximize its potential indemnity recovery.
Assuming for the purpose of argument that the evidence established an allocation of $8,631,300 of the total settlement to phase I and an allocation of $2,798,640 of Dillingham and CHN's total settlement contributions toward the 13 architectural defects had been made by the defendants at the time the global settlement was negotiated, it was made in a nonadversarial context. It had no impact on anyone but Dillingham, the sole party who intended to pursue nonsettling defendants. Plaintiff Association had no reason to care, since its members were satisfied by a total recovery of $15 million no matter how defendants chose to allocate it. The subcontractors, having underpaid under everyone's calculation, were in no position to concern themselves with how their contributions were split between claims. And CHN, having assigned to Dillingham all its rights to indemnity, was clearly interested only in putting the litigation behind it.
An allocation that is collusive, and not the result of adverse negotiations between parties with competing interests, is suspect under the uniform authority of Alcal, Erreca's, and Regan Roofing. Those cases hold that if the allocation appears to be the result of collusion between parties, the trial court must find that the settlement, or at least the allocation, was not in good faith as a matter of law, and reject the settlement. The court in Peter Culley agreed and further held: "... A presumption that the parties have reasonably allocated a settlement amount between issues in the action should be reserved for a settlement by parties with truly adverse interests in the allocation. [Citation.]" (10 Cal.App.4th at p. 1498, 13 Cal.Rptr.2d 624.)[11]
By failing to have an adversarial allocation, Dillingham eliminated two steps in the process, or two potential levels of "review": that of the adverse parties and that of the trial court. This allowed Dillingham to receive the benefit of an $8,631,300 allocation of proceeds to phase I, an allocation which is unlikely to have been agreed to or approved by the trial court. In sum, the only way the use of settlement figures can be fair to a nonsettling defendant such as Nadel is if they arise in an adversarial context, not when they are merely amounts the settling parties are willing to put forward at the time of trial against the proposed indemnitor. If they are not willing to put everything, including secret allocations, before the trial court on the good faith hearing, they cannot obtain the evidentiary benefit of a good faith finding.

*221 D
Having concluded that Dillingham's recovery from Nadel cannot be based on undisclosed allocations purportedly made during settlement negotiations which were nonadversarial in nature, we must consider how recovery is to be determined under the facts presented.
The cases indicate that where the settling parties have failed to allocate, the trial court must allocate in the manner which is most advantageous to the nonsettling party. This outcome is set forth in Knox v. County of Los Angeles, supra, 109 Cal.App.3d 825, 167 Cal.Rptr. 463, one of the first cases to recognize that application of American Motorcycle could have unexpected results for parties in a multi-defendant case in which (1) both joint and individual claims had been asserted against different defendants; (2) fewer than all defendants settled; and (3) there was no provision in the settlement agreement setting forth how the settling parties intended the settlement proceeds to be allocated between claims. In Knox, plaintiffs believed they had been falsely arrested while picketing outside defendant market, and brought claims for false arrest and violation of civil rights against the market and the county which employed the deputies who carried out the arrest. Their complaint also alleged separate claims against the county alone based on injuries which occurred during transport, booking, and detention following the arrest. Plaintiffs settled with the market for $4,000 each, dismissing their civil rights claims and proceeding against the county only on false imprisonment and the post-arrest injuries. After trial, they were awarded $17,500 each from the county.
The county sought reduction of the $17,500 judgment by the entire $4,000 previously paid to plaintiffs, but the trial court refused to reduce it by any amount, presumably because the court believed the $4,000 was in settlement of the dismissed civil rights claims. The appellate court sided with the county. Because "Market Defendants were `claimed to be liable' for unlawful arrest and false imprisonment jointly with County Defendants... defendants were entitled to a credit in some amount," absent a showing by plaintiffs that none of the consideration paid for the settlement related to the joint causes of action. (Knox v. County of Los Angeles, supra, 109 Cal.App.3d at pp. 831-832, 167 Cal.Rptr. 463, emphasis added, fn. omitted.) Moreover, the court went on, because the facts of the case and settlement, including knowledge of what that credit should be, were uniquely within the knowledge of plaintiffs and settling defendants, "the [trial] court should have required an evidentiary showing by plaintiffs establishing and justifying an agreed allocation of less than all of the $4,000 settlement figure to the [false imprisonment] causes of action." (109 Cal. App.3d at p. 836, 167 Cal.Rptr. 463, emphasis added.) "Absent some good faith agreement between plaintiffs and Market Defendants allocating the settlement consideration as between the six causes of action in which joint tortfeasor status was alleged, defendants were entitled to a setoff of the entire settlement figure." (Ibid., emphasis added.)
The same sentiment was expressed in Alcal, supra, wherein the appellate court stated: "... If any of [the settling defendants] did not allocate part of its settlement to nonroofing issues, roofer may obtain an offset for the entire amount of that defendant's settlement." (8 Cal.App.4th at p. 1127, 10 Cal.Rptr.2d 844, emphasis added.)
In many situations of this kind where a settling defendant pursues a cross-claim for partial indemnity against a party who is not jointly and severally liable for all claims, allocating settlement proceeds in the way that most benefits the nonsettling defendant would mean that the cross-complainant recovers nothing because the proceeds should first be allocated to those for which the settling defendant is liable. For example, in view of the fact that the jury found that CHN was not liable for the 13 architectural defects, CHN's settlement payment should first be allocated to non-architectural problems. However, a finding that CHN paid nothing toward the architectural defects would not be justified under the uncontradicted facts of the present case.
First, plaintiff resolved its entire claim in exchange for the settlement payment of $15,220,659 *222 not just the non-architectural portion. It does not matter that this may have represented only a fraction of the amount plaintiff could have recovered from settling defendants alone. (See Gross v. Allen (1994) 22 Cal.App.4th 354, 361, 27 Cal.Rptr.2d 429 [to recover on an indemnity cross-claim against a nonsettling defendant, settling defendant not required to proved that amount paid exceeded his "inchoate liability."].) Since settling defendants bought peace for all defendants, we know that they paid Nadel's share of the damages.
Second, although the jury was not asked to make a finding on total damages, according to the uncontradicted testimony of Robert James, the construction expert for respondents, total damages for phase I were approximately $5.9 million. This, together with the testimony of the Association's attorney Bruce Mayfield that the damages for phase I and phase II were approximately equal, puts total damages in the $12 million range. That the jury agreed with these figures can be deduced from the fact that the jury found that damages from the 13 architectural defects totaled $3,437,494, and calculated reasonable settlement payment numbers based on the relationship between $5.9 million and the phase I settlement number advanced by Dillingham. We conclude from this evidence that Nadel owes the settling defendants 10 percent of $3,437,494.
Nadel does not dispute that it is liable for this amount. Nor does it dispute that since the settling subcontractors underpaid in relation to their percentage of liability, either Dillingham or CHN, the only other parties involved in phase I, paid for its share of the damages. Consequently, we conclude that on the evidence presented and making all allocations in favor of Nadel, that Dillingham, as the assignee to CHN's indemnity claim, is entitled to recover from Nadel the $343,749.40 which represents Nadel's 10 percent share of the damages arising from the 13 architectural defects.

DISPOSITION
The matter is remanded to the trial court. The trial court is directed to modify the judgment to reflect that Dillingham is to recover equitable comparative indemnity from Nadel in the sum of $343,749.40. In all other respects, the judgment is affirmed. Nadel is to recover its costs on appeal.
CHARLES S. VOGEL, P.J., and HASTINGS, J., concur.
NOTES
[1] This represented more than 10 percent of $4,658,677 due to the need to compensate for certain settling defendants who underpaid.
[2] Shapiro was also pursued by Dillingham in a cross-claim for indemnity but was absolved of liability by the jury.
[3] As we understand it, all of the subcontractors except the framer for the entire project, Lee Bolin and Associates, Inc., and one or two others too indigent to do so, contributed to the settlement.
[4] The jury added $37,000 to this number to get their figure for actual damages for the 13 defects of $3,437,494, no doubt based on relocation costs. James had testified that total relocation costs for phase I should have been around $378,000.
[5] At that point, counsel for Nadel objected to any testimony from the lawyers because they had not been designated as experts. The court inquired whether opinion testimony would be offered by Mayfield, and counsel for Dillingham persuaded the court it would not. Counsel for Nadel also objected to attorney testimony on the ground that why the lawyers did anything was irrelevant. The trial court ruled that the lawyer could testify as to how the Association's $51 million claim should be broken down.

At another point, these parties discussed with the court the allocation of the settlement between Dillingham and Lee Bolin. Dillingham wanted $600,000 of the settlement, which counsel represented was $1.65 million, to be allocated to attorney fees. The court ruled that this would be allowed and that it would also allow testimony on how to allocate settlement proceeds between different defects. The court made clear at that time it was going to allow the attorney for Dillingham to testify as to how settlement amounts should be allocated over the protest of Nadel's attorney.
We reference these discussions because Dillingham suggests in its brief that Nadel either waived its objection to attorney testimony, or somehow failed to make clear the basis for its objection.
[6] When Boon sought to testify as to how to allocate the subcontractors' contributions between the two phases, Nadel's counsel objected and moved to strike his testimony on grounds of improper opinion, failure to designate, and lack of foundation. The court overruled the objection. The court also overruled an objection as to whether the 50-50 allocation was "fair." Thereafter, the court recognized a continuing objection to this type of testimony from Nadel's counsel, and overruled it "insofar as the witness as a percipient witness is simply explaining the methods by which these figures were arrived at or broken down."
[7] There is no dispute that the only other persons or entities involved in this aspect of the project were the settling subcontractors and Lee Bolin.
[8] Because we agree that substantial evidence does not support the finding that $4,658,677 was reasonably allocated to settlement of the architectural defects, we do not reach the issue of whether the trial court erred in its calculation of damages. For an example of how to compute recovery when two settling defendants seek indemnification from a third, nonsettling defendant, see Sagadin v. Ripper (1985) 175 Cal. App.3d 1141, 221 Cal.Rptr. 675.
[9] Code of Civil Procedure section 877.6, subdivision (e) provides for review of the good faith determination by way of writ proceeding.
[10] This provision places the burden of proving lack of good faith on the party contesting a good faith determination.
[11] For an example of the types of information presented to trial courts to support a good faith allocation see Erreca's, supra, 19 Cal.App.4th at page 1491, 24 Cal.Rptr.2d 156, in which the court said: "[B]y allocating $1.5 million out of the total settlement to the soils issues, the parties effectively reduced the amount of the setoff available to the soils defendants.... To evaluate the good faith of this allocation, the trial court was required to evaluate the showing made in support of the good faith settlement determination." Plaintiffs' showing included their attorney's declaration estimating plaintiffs' total cost of repairs at $14,668,789, with a cost of repair estimate for soils set at $8,702,650. But plaintiffs' settlement demand set a soils figure of $2 million. By contrast, the developers' geotechnical engineer's declaration estimated soils repairs costs at only $175,000 to $200,000. The developers estimated overall preliminary repair costs at $1,092,875 to $1,243,647, excluding hardscape and foundation repairs. (See also L.C. Rudd & Son, Inc. v. Superior Court (1997) 52 Cal.App.4th 742, 753, 60 Cal.Rptr.2d 703 ["The parameters of the `ballpark' for the purpose of allocating the settlement proceeds between discrete claims are limited by evidence of the relation of the claims to the whole of the settlement amount. In this case, the special master found the `soils and foundation' claims constituted approximately 55.1 percent to 61.1 percent of the total cost of repairs. This is the `ballpark' for purposes of allocation."].)